IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY J. BARTHELEMY ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | 2:16-cv-00542 |
| | ) | |
| v. | ) | |
| | ) | |
| MOON AREA SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

The crux of this Equal Pay Act lawsuit is a claim that the Moon Area School District ("the District" or "the Defendant") paid the Plaintiffs less because they are men. Since 2016, the Court has heard the Parties' arguments and reviewed reams of status reports, briefings, and record evidence. And now, having filed cross-motions for summary judgment, the Parties each announce that their cases are made and they should be declared the winner as a matter of law. However, the Court concludes that the Record before it does not quite make the grade for that to happen in either direction. Under the precedent set by our Court of Appeals, the Defendant has not definitively shown, as it must under applicable law, that its salary decisions were made for nondiscriminatory reasons. However, the Plaintiffs have also not established as a matter of law that they were paid unequally on the basis of their sex as prohibited by the Equal Pay Act. For these reasons and those that follow, the Plaintiffs' and Defendant's cross-Motions for Summary Judgment (ECF Nos. 100, 104) are each denied.

## I.    **PROCEDURAL HISTORY**

The Plaintiffs, nine (9) male public school teachers in the Moon Area School District, filed Equal Pay Act ("EPA") claims alleging the District paid the Plaintiffs less than similarly situated female teachers.[1] (ECF No. 6.) The District filed its Answer shortly thereafter. (ECF No. 10.) More than two and a half years later, after lengthy discovery and multiple mediations that did not in the end resolve the case[2], both parties filed Motions for Summary Judgment. (ECF Nos. 100, 104.) The parties fully briefed the issues, filed a vast quantity of supporting material, and the Court heard oral argument in September 2019. (ECF Nos. 101–103, 105–114, 121–128, 130, 134.) At oral argument, the Plaintiffs made an oral motion to exclude the testimony and report provided by the Defendant's proffered expert witness, James Fellin, and requested a *Daubert* hearing. (ECF No. 138, at 3:14–19.) The Court then subsequently held a *Daubert* hearing, which spanned two days and during which the Court granted the Plaintiffs' motion to exclude the proffered Fed. R. Evid. 702 testimony of Mr. Fellin, for reasons the Court stated orally on the Record.[3] (ECF No. 136, 140, 141.) This matter then became ripe for decision.

---

[1] There were originally twelve (12) plaintiffs. Three plaintiffs filed stipulations of dismissal. (ECF Nos. 71–73.)

[2] Apparently, in the most recent mediation, the Plaintiffs and the District's designated representatives (which apparently included a couple of school board members) did reach a deal to wrap up the case, but that "deal," such as it was, was not approved by the District's Board of School Directors as would be required by state law. Thereafter, the case marched on, including the work necessary to bring the case to this point. By all reports, this included the extensive briefing and argument involved in these competing motions, related *Daubert* litigation, along with 50+ oral depositions as part of the lead up to where we are now.

[3] Accordingly, Mr. Fellin's testimony and his report as-provided were not considered for the purposes of the Court's ruling on the parties' cross-Motions for Summary Judgment. (ECF No. 140.) As discussed, *infra*, the Court did consider some of the underlying data from the report, as appropriate. The long and the short of it was that Mr. Fellin's expertise is as a forensic accountant, and while he presented certain arithmetical summaries in support of his assertions in support of the Defendant's position, in reality, his testimony did not "fit" this case or the issues in it, his expertise was not of the nature that would aid a fact-finder in doing its work in this action, and in the end, in the Court's estimation, his testimony really amounted to not much more than the presentation of legal and factual arguments via a witness labelled as an "expert". For the reasons the Court noted at length on the record, his proffered testimony could not leap (or even step) over the *Daubert* bar in a number of ways, and was excluded from consideration.

## II.   STATEMENT OF THE FACTS

### A.  Moon Area School District Salary and Hiring Determinations

Moon Area School District is located just outside of Pittsburgh, Pennsylvania and educates nearly 3,900 students from Moon and Crescent Townships in Allegheny County.[4] Teachers within the District are hired according to a salary schedule pursuant to a Collective Bargaining Agreement. (Def.'s Concise Statement of Material Facts, ECF No. 101, at 1.) The schedule places a teacher into a "Step" and a "Lane." (*Id.*) Steps typically reflect the number of years the teacher has worked for the District and Lanes reflect their education level—either a bachelor's or master's degree. (*Id.* at 2.) Accordingly, teachers begin at Step 1 and will move up a Step for every year they work for the District. (*Id.*) For instance, a teacher with a master's degree who worked for the District for three years would be classified as an "M-3."

The District also implemented unwritten Guidelines for placing lateral hires into a Step and Lane. (*Id.*) These Guidelines were created sometime between 2000 and 2001. (*Id.* at 3) They were intended to reflect prior teaching experience outside of the District such that a teacher with four or more years of prior teaching experience could be hired at Step 2 or higher, even if it is their first year working for the District. (*Id.* at 2.) Prior teaching experience in a parochial or private school was usually not credited under these procedures, although it was occasionally considered. (*Id.*) The unwritten Guidelines would place teachers with one to three years of prior teaching experience at Step 1. (*Id.*) Those with four to six years would be placed at Step 2. (*Id.*) And teachers with seven or more years of prior teaching experience would be placed at Step 3. (*Id.*) However, in some instances, lateral hires were placed above the Step which the Guidelines prescribed—so-called "above-Step" hires. (*Id.*; Def.'s Br. in Supp., ECF No. 102, at 6.) The exact reasons for the

---

[4] ABOUT MOON AREA SCHOOL DISTRICT, https://www.moonarea.net/content/598 (last visited Feb. 5, 2020).

Step placement of certain female lateral hires and whether these Guidelines were consistently applied is at the center of this case.

The process by which teachers were hired is also relevant. There are multiple interview rounds during which a candidate meets with school administrators and teaches a mock class. (ECF Nos. 101, at 3; 102, at 8.) On at least some occasions, administrators in these interviews would take notes and score candidates on several bases, such as "educational perspective," "strengths and weaknesses," and "motivational techniques." (*See, e.g.*, Def.'s App'x, ECF No. 103-61, at 1.) After these interviews, administrators would make formal recommendations of their selections and proposed salary levels to the District's Board of School Directors. (Def.'s Br. in Opp'n, ECF No. 125, at 5.) The Board then votes on the hiring in an open session. (*Id.*) One thing that the parties agree on is that when quizzed on the topic during the discovery process, the members of the School Board (past and present) could not recall or did not know why the female teachers, which the Plaintiffs identified as comparators in this case, were placed at certain Step levels more advantageous to those female teachers. (*Id.*)

**B. Plaintiffs**

There are nine (9) Plaintiffs remaining in this action. Each held at least one educational certification and had prior public-school teaching experience. Accordingly, there are nine (9) Counts against the District alleging EPA violations—one per Plaintiff. (ECF No. 6.)

### *1. Barry Barthelemy – Hired at Step 1*

Barry Barthelemy held a certification in Elementary K–6 education and the District hired him for the 2006–07 academic year to teach third grade. (Pls.' Br. in Supp., ECF No. 114, at 7.) Prior to his hiring by the District, Mr. Barthelemy taught for three years in another public-school district in Pennsylvania. (*Id.*) Mr. Barthelemy was hired at Step 1. (*Id.*)

### 2. Christopher D'Eramo – Hired at Step 2

Christopher D'Eramo held a certification in Social Studies 7–12. (*Id.* at 8.) The District hired Mr. D'Eramo during the 2006–07 academic year to teach high school social studies. (*Id.*) Barthelemy taught for three and a half years in another public-school district in Pennsylvania. (*Id.*) Plaintiffs aver he was hired at "Step 1.5." (*Id.*) However, Mr. D'Eramo's Formal Notice of Hiring states he was hired at Step 2, but that his salary would be prorated because his start-date was in the middle of the academic year. (ECF No. 103-32, at 1.)

### 3. Joseph Espey – Hired at Step 1

Joseph Espey held a certification in Elementary K–6 education. (ECF No. 114, at 10.) The District hired him for the 2005–06 academic year to teach fifth grade. (*Id.*) After teaching for three years in public schools outside of Pennsylvania, the District hired Mr. Espey at Step 1. (*Id.*)

### 4. Jason Ferri – Hired at Step 3

Jason Ferri held a certification in Social Studies 7–12 and the District hired him for the 2003–04 academic year to teach high school social studies. (*Id.* at 11.) After teaching for seven years in a public-school district in Pennsylvania, the District hired Mr. Ferri at Step 3. (*Id.*)

### 5. Christopher Herman – Hired at Step 1

Christopher Herman held a certification in Health/Physical Education K–12 and the District hired him for the 2007–08 academic year to teach elementary physical education and computers.[5] (*Id.* at 12; ECF No. 103-35, at 1.) After teaching for one year in a public-school district in Pennsylvania and one year in a public-school district in Ohio, the District hired Mr. Herman at Step 1. (ECF No. 114, at 12.)

---

[5] The Plaintiffs stated that Herman was hired for the 2008–09 school year, citing to their Concise Statement of Material Facts and the Amended Complaint. (*See* ECF No. 105, at 18.) However, Herman's hiring notice states that he was hired for the 2007–08 academic year. (ECF No. 103-35, at 1.)

### 6.   Timothy Hrivnak – Hired at Step 2

Timothy Hrivnak held dual certifications in Biology and General Science 7–12 and the District hired him for the 2003–04 academic year to teach biology. (*Id.* at 13.) After teaching for three years in a public-school district in Pennsylvania and two years in a public-school district outside of Pennsylvania, the District hired Mr. Hrivnak at Step 2. (*Id.* at 14.)

### 7.   Eric Jacoby – Hired at Step 1

Eric Jacoby held dual certifications in Elementary K–6 and Special Education. (*Id.* at 15.) The District hired him for the 2003–04 academic year to teach learning support K–2. (*Id.*) After teaching for one year in a public-school district in Pennsylvania and four years in a Catholic school, the District hired Mr. Jacoby at Step 1. (*Id.*)

### 8.   Jason Persing – Hired at Step 1

Jason Persing held a certification in Health/Physical Education K–12 and the District hired him for the 2005–06 academic year to teach high school physical education.[6] (*Id.* at 16; ECF No. 103-23, at 1.) Prior to his hiring, Mr. Persing taught as a long-term substitute teacher in the District for one year and taught for three years in another public-school district in Pennsylvania. (*Id.*) The Plaintiffs aver that Mr. Persing was eventually hired at Step 2 as a result of the mandate of the Pennsylvania Supreme Court in *Mifflinburg Area Education Association v. Mifflinburg Area School District*, 555 Pa. 326 (1999). (*Id.* at 16 n.5.) Mr. Persing's Formal Notice of Hiring shows that he was initially hired at Step 1, and an attached handwritten note says that he would "move to Step II in Jan. '06." (ECF No. 103-23, at 1–2.) Thus, it appears he was paid at Step 1 for half of a school year.

---

[6] The Plaintiffs stated in their filings that Persing was hired for the 2004–05 school year, citing to their Concise Statement of Material Facts and the Amended Complaint. (*See* ECF No. 105, at 19.) However, Persing's hiring notice states that he was hired for the 2005–06 academic year. (ECF No. 103-23, at 2.)

### 9. *Sidney Wood – Hired at Step 1*

Sidney Wood held a certification in Elementary K–6 and the District hired him for the 2006-07 academic year to teach third grade. (ECF No. 114, at 18.) After teaching for two years in a public-school district in Pennsylvania, the District hired Mr. Wood at Step 1. (*Id.*)

### C. **Above-Step Hiring and Plaintiffs' Comparators**

The Defendant has proffered several nondiscriminatory reasons for why some teachers may have been hired above-Step. The Court concludes that there are five (5) overarching justifications articulated by the Defendant that it purported to apply to one or more degrees in the case of each proffered female comparator. First, the District's "acute" need to hire teachers with certain certifications or skillsets, which would vary year-to-year. (ECF No. 102, at 7–8, 15.) Second and relatedly, the need to fill sudden vacancies. (*Id.* at 7, 15.) Third, the need to secure the best possible teachers for the District—often referred to as "rock stars"—and the District's desire to match their previous salary in order to attract them to the District. (*Id.* at 8–9; 23.) Fourth, a candidate's excellent credentials or experience and their ability to therefore negotiate a higher salary. (*Id.* at 16–17, 22, 28.) And fifth, the economic reality at the time of hiring, such as the availability of suitable candidates, market demands, new school programming, and other changing needs of the District. (*Id.* at 10, 15.)

The Defendant avers that hiring philosophies also differed depending on who was the Superintendent of the District at the time. All the Plaintiffs were hired between 2003 and 2007 by either Superintendent Dr. Alexander Meta or Dr. Donna Milanovich. (*Id.* at 11.) Dr. Meta was Superintendent from 2002 until 2007 and Dr. Milanovich was Superintendent from 2007 until 2013. (Meta & Milanovich Deps., ECF Nos. 103-3, at 2; 103-6, at 2.) Both Superintendents relied on the unwritten Guidelines to make Step placements for lateral hires. (ECF No. 102, at 11, 14.)

Two (2) of the proffered comparators were hired under Superintendent Dr. Susan Taylor, who preceded Dr. Meta and Dr. Milanovich.[7] (*Id.* at 16–18.) Five (5) such comparators were hired under Superintendents Meta and Milanovich.[8] (*Id.* at 18–22.) The remaining eleven (11) proposed comparators were hired under Superintendent Curtis Baker.[9] (*Id.* at 23–29.)

The Defendant states that Superintendent Baker implemented additional guidelines aimed at hiring so-called "rock stars." (*Id.* at 22–23.) These "Baker Guidelines" preferred teachers with prior experience and directed that one year of credit be given for each year worked, up to a maximum of Step 3 or 4. (*Id.*) Additionally, candidates were sometimes offered a Step level that provided them with a salary commensurate to what they were currently making in order to attract them to the District. (*Id.* at 23.) However, the Defendant's record evidence corroborating the "Baker Guidelines" is, to put it mildly, minimal. When discussing the "Baker Guidelines" directive to hire "rock stars," the Defendant routinely cites Mr. Baker's affidavit and deposition testimony by Assistant Superintendent Caroline Johns.[10] (*See, e.g.*, *id.* at 22–23.) The Baker Affidavit is only two pages in length and does not specify how he directed prior experience be credited. (*See* ECF No. 103-9.) Rather, Mr. Baker makes six arguably relevant statements: (1) none of the plaintiffs were hired while he was the superintendent; (2) he did not have authority to hire candidates but did make hiring recommendations to the School Board; (3) there were no written guidelines regarding recommendations for hiring teachers with prior experience; (4) he believes his philosophy for making hiring recommendations was "somewhat different" from that of prior

---

[7] Nancy Burgunder and Melissa Sebastian.

[8] Amy Pannebaker, Adrianne Kaminsky, Julie Rudi, Melissa Mayo, and Sarah Durham.

[9] Megen Harmon, Morgane Evans, Kattreena Amodeo, Caryn Glassbrenner, Alicia Schooley, Kaitlyn Robson, Kaylee Stewart, Katelyn Schulmeister, Bridget (Dawson) Hinterliter, Amber Graves, and Jennifer (LeGrand) Mattucci.

[10] Superintendent Baker was not deposed in this case. The Defendant stated at oral argument that Mr. Baker has his own lawsuit against the District and no longer lives in the area.

superintendents; (5) this philosophy was "based upon the concept of hiring the best teachers available and paying them for their prior experience in accordance with the collective bargaining agreement" and District policy; and (6) to the best of his knowledge, during his tenure no teacher was hired or placed at a particular salary level based upon gender. (*Id.*) Caroline Johns' deposition testimony fails to add much detail:

> Q:   Did you ever have any discussion with Mr. Baker as to how the District would determine the step that it would offer to a new teacher?
>
> A:   *Not specifically*. I know he had a philosophy of he seemed to want to pay well for people who were highly qualified, as he referred to them as "rock-star teachers," *but we didn't talk specifically about the steps*.
>
> Q:   Okay. And you said he seemed to have a philosophy of wanting to pay well?
>
> A:   Uh-huh.
>
> Q:   How did you know that that was his philosophy?
>
> A:   Well, because he would tell us he wanted the best candidates, that whoever we brought him needed to be rock stars, and that essentially if we didn't have a rock star come out of the interview process, we needed to start over.

(Johns Dep., ECF No. 103-7, at 2 (emphasis added).) Thus, the most that can be gathered about the proffered "Baker Guidelines" is that Superintendent Baker directed administrators to seek out highly qualified teachers and to pay them well.[11] (*Id.*; ECF No. 103-9.) However, these administrators are largely unable to recall exactly why the District hired the proffered comparators above-Step.

---

[11] The underlying hiring data referenced in the Fellin Report show that there were more above-Step hires during Superintendent Baker's tenure. (ECF No. 103-2, at 42.) The Defendant did not cite to this data as circumstantial evidence of the "Baker Guidelines," but the Court took it into consideration. *See infra* Part III.B.2.b.ii.

The parties provided an abundance of material to support their Motions, consisting of depositions, resumes, notices of hiring, job applications, interview notes, hiring contracts, hiring records, and the like. (*See* Def.'s App'x, ECF No. 103; Pls.' App'x, ECF Nos. 106–112.) The Court scrutinized all of this record evidence to determine which facts were material, whether they were adequately supported, and whether there remain genuine disputes as to material facts. In reviewing these documents, the Court concludes the following with respect to the comparators the Plaintiffs identified.

### 1. Nancy Burgunder – Hired at Step 2

Nancy Burgunder held three Pennsylvania certifications—Business Technology, Accounting, and Secretarial. (ECF No. 102, at 16 (citing Burgunder Application, ECF No. 103-37, at 1).) Ms. Burgunder was hired above-Step in July 2000 during Superintendent Taylor's tenure. (*Id.*) Prior to being hired at a Step 2, Ms. Burgunder taught for two years at Pittsburgh Public Schools and for one year as a substitute teacher in South Fayette, Pennsylvania. (*Id.* (citing Burgunder Resume, ECF No. 103-38).) The Defendant avers that Business Technology certifications are "difficult to find" in Pennsylvania, but only cites its interrogatory answers and the stricken Fellin Report. (*Id.* at 17.) Neither source directly substantiates this claim, but rather they restate it in conclusory fashion. (*See* ECF Nos. 103-1; 103-2.) The Defendant also avers that Ms. Burgunder, vis-à-vis her qualifications and the District's hiring needs, was able to negotiate an above-Step salary. (ECF No. 102, at 17.) However, the Defendant fails again to cite any direct evidence of this negotiation. Rather, it cites generally to the deposition of William Addy, as well as the same interrogatory answers and the excluded Fellin Report. (*Id.*) Mr. Addy testified in his deposition in general terms that some teachers might be able to negotiate for higher salary when

there is high demand and low supply. (Addy Dep., ECF No. 103-5, at 5.). He did not specifically tie that to Ms. Burgunder.

### 2.   *Melissa Sebastian – Hired at Step 3*

Melissa Sebastian held dual certifications in special education for grades K–12 and elementary education for grades K–6. (ECF No. 102, at 17 (citing Sebastian Dep., ECF No. 103-45, at 2–3).) Ms. Sebastian was also hired above-Step under Superintendent Taylor in August 2001. (*Id.*) Prior to the District hiring her at Step 3, Ms. Sebastian taught for three years in another Pennsylvania public-school district and for five years at a private school. (Sebastian Resume, ECF No. 103-42, at 1.) She was one of over twenty candidates for special education positions within the District. (Sebastian Letter of Recommendation, ECF No. 103-47.) The Defendant states that Ms. Sebastian's dual certifications provided the District with greater flexibility in scheduling and that she was able to negotiate a higher salary. (ECF No. 102, at 17.) However, there is no record evidence to back up these claims. When asked in her deposition whether she recalled salary negotiations, Ms. Sebastian said she assumed she discussed it and that "possibly [she] could have asked to be compensated for [her] experience. But again, this is all speculation." (Sebastian Dep., ECF No. 124-22, at 23.) She could not recall asking to be placed on any particular Step. (*Id.* at 28.) However, Ms. Sebastian was able to recall that, at the time, "it was very difficult to find good special ed teachers," and that she was "very impressive" during her interview. (*Id.* at 26.)

### 3.   *Amy Pannebaker – Hired at Step 3*

Amy Pannebaker was hired in June 2005 during Superintendent Meta's tenure. (ECF No. 102, at 18.) Prior to coming to the District, Ms. Pannebaker taught for three and a half years in a public-school district in Texas. (*Id.*) Ms. Pannebaker also had several other accolades. She helped write the mathematics curriculum for the State of Texas, developed a remedial mathematics

curriculum for an elementary school in Pennsylvania, she was a project assistant at the National Science Foundation, and she substitute taught in the District for a school year. (*Id.* (citing Pannebaker Resume, ECF No. 103-48, at 1).) The Texas Association for Supervision and Curriculum Development named Ms. Pannebaker a Mathematics Curriculum Fellow for Project ABCD in 1992. (ECF No. 103-52.) Ms. Pannebaker was also certified to teach Elementary K–6. (ECF No. 103-48, at 2.) The Defendant attributes Ms. Pannebaker's above-Step placement to her "substantial and much needed experience." (ECF No. 102, at 19.) However, every administrator deposed regarding Ms. Pannebaker's hiring could not recall whether her experience was a factor taken into consideration for her Step placement. (*See* Deps. of Willian Addy, Michael Hauser, Alexander Meta, Donna Milanovich, Bille Rondinelli, Lisa Wolowicz, and Ronald Zangaro, ECF Nos. 124-1, at 54; 124-8, at 73; 124-14, at 30; 124-15, at 38; 124-18, at 27; 124-19, at 42; 124-27, at 31; 124-28, at 39.) One former administrator, Dr. Bille Rondinelli, testified generally about the details of Ms. Pannebaker's resume that may have contributed towards her above-Step placement. (ECF No 124-18, at 31–35.) However, Dr. Rondinelli admitted that these were assumptions based on a review of Ms. Pannebaker's resume, which she had in front of her at the time she was testifying. (*Id.* at 35.)

### 4. Adrianne Kaminsky – Hired at Step 2

Adrianne Kaminsky was hired in August 2013 during Superintendent Milanovich's tenure. (ECF No. 102, at 19.) Ms. Kaminsky came to the District with six years of prior teaching experience at a Catholic school in Pennsylvania. (*Id.*) Ms. Kaminsky's resume shows that she was an experienced language teacher at the time she was hired, having taught seven levels of Spanish and introductory Italian. (ECF No. 103-53, at 1.) Ms. Kaminsky, who had no public-school teaching experience, was hired at Step 2. (ECF No. 102, at 19.) The Defendant attributes Ms.

Kaminsky's above-Step placement to the fact that foreign language teachers are difficult to find and because she was hired at the same time as another Spanish teacher, Erin Fischerkeller. (*Id.*) The District avers that because Ms. Kaminsky and Ms. Fischerkeller worked in close proximity and for "obvious morale reasons," the District decided to place Ms. Kaminsky on Step 2, presumably equivalent to Ms. Fischerkeller's Step placement. (*Id.*) However, there is no record evidence to support that Ms. Kaminsky's Step placement had anything to do with "morale reasons." The Defendant also cites Dr. Milanovich's deposition to corroborate the difficulty in hiring foreign language teachers. Dr. Milanovich testified, "[t]here may have been a foreign language position, but I think that we just had to search harder to get qualified candidates." (ECF No. 124-15, at 59–60.)

### 5.  *Julie Rudi – Hired at Step 3*

Julie Rudi was hired in 2010 during Dr. Milanovich's tenure as Superintendent. (ECF Nos. 102, at 20; 103-63, at 1.) Ms. Rudi had between four and six years of teaching and instructional experience in another public-school district in Pennsylvania before the District hired her at Step 3. (*Compare* ECF Nos. 103-62, at 1; 106-14, at 21 *with* ECF No. 109-3, at 2.) A review of the Record indicates that she held dual certifications in Elementary Education and Special Education at the time she was hired. (ECF No. 103-66, at 1.) The Defendant avers the District was hiring approximately forty (40) teachers the year that it hired Ms. Rudi. (ECF No. 102, at 21). The Defendant says Ms. Rudi was placed on Step 3 so that her starting salary would be comparable with her former salary.[12] (*Id.* at 20.) Ms. Rudi corroborated in her deposition that her salary at the District was comparable to her former salary. (ECF No. 106-14, at 19.) However, she could not recall any discussions with District administrators about her Step placement. (*Id.* at 19–20.) The

---

[12] Ms. Rudi's prior salary was $43,252. (Rudi Application, ECF No. 103-66, at 2.) Her salary in the District at Step 3 was $46,350, or about 7% higher. (Rudi Employment Contract, ECF No. 103-63, at 1.)

District was also "aware of her excellent teaching ability" because the recently-hired principal at the school to which Ms. Rudi was assigned had been a previous colleague of hers. (ECF No. 102, at 21 (citing Milanovich Dep., ECF No. 106-11, at 43:2–44:9).) Former Director of Administrative Services and Assistant Superintendent Ron Zangaro testified that the principal may have wanted Ms. Rudi in order to help "establish a transition." (ECF No. 108-1, at 75:10–76:14.) This may have contributed, he testified, to her above-Step placement. (*Id.*)

### 6. *Melissa Mayo – Hired at Step 3*

Melissa Mayo was also hired in 2010 during Dr. Milanovich's tenure. (ECF No. 102, at 21.) Ms. Mayo had three years of prior teaching experience at a public charter school. (ECF Nos. 103-67, at 1–2; 106-9, at 13–22.) The District hired her at Step 3. (ECF No. 102, at 21). Ms. Mayo held three certifications at the time—English Grades 7–9, Special Education, and Social Studies Grades 7–12—and she was a Special Education "pull out" teacher for Language Arts. (*Id.* (citing Mayo Resume, ECF No. 103-67); ECF No. 106-9, at 13–22.) At the time Ms. Mayo was hired there were new Pennsylvania Special Education requirements, which would have made Ms. Mayo a desirable candidate. (ECF No. 102, at 21 (citing Zangaro Dep., ECF No. 108-1, at 70–73).) The Defendant states that Ms. Mayo "inquired as to whether she could be placed on a higher salary step." (*Id.*) Additionally, the Defendant avers that due to Ms. Mayo's significant credentials she was able to negotiate with the District for higher pay. (*Id.* at 22.) The Defendant cites no record evidence for these claims. In fact, in her own deposition, Ms. Mayo testified that she was *offered* Step 3 during an interview with District administrators. (ECF No. 106-9, at 28–29.) The administrators did not say why they were offering Step 3 and Ms. Mayo neither asked why it was offered, nor was it negotiated. (*Id.* at 29, 32 ("Q: Did you ask for a higher step at that interview . .

. A: I did not.").) The Defendant also states that Step 3 pay was comparable to Ms. Mayo's former salary.[13]

### 7. *Sarah Durham – Hired at Step 2*

Sarah Durham was hired in 2013 during Superintendent Milanovich's tenure. (ECF No. 102, at 22.) Ms. Durham taught for two years in an Ohio public-school district before the District hired her at Step 2. (Durham Resume, ECF No. 103-77, at 1.) She also had experience as a student teacher at a Pennsylvania school during the year prior to her time in Ohio. (*Id.*) Ms. Durham held a teaching certification in Business, Computers, and Information Technology and the District hired her to teach in its business department. (*Id.*; ECF No. 102, at 22.) At the time she was hired, there were three applicants for two positions and the District hired a male teacher for the other position, who was also placed above-Step. (ECF No. 102, at 22.) One School Board Director recalled that Ms. Durham was hired when the District "needed business teachers" and the teaching slot was a "harder-to-fill position[ ]." (Testa Dep., ECF No. 106-19, at 69:7–13.)

### 8. *Megen Harmon – Hired at Step 2*

Megen Harmon was hired in 2014 under Superintendent Curtis Baker. (ECF No. 102, at 23.) Ms. Harmon held dual certifications in Biology and Chemistry and was hired at Step 2, even though she had only one year of prior public-school teaching experience. (*Id.*; Harmon Resume, ECF No. 103-83, at 1.) However, Ms. Harmon was also a long-term substitute science teacher for one year and five months prior to that. (ECF No. 103-83, at 1.) At the time she was hired, the District says that Ms. Harmon was the only viable candidate with a biology/chemistry specialty when the District was having trouble filling a science teacher position. (ECF No. 102, at 23.) However, there is no direct evidence cited for this claim. (*Id.* (citing Addy Dep., ECF No. 106-1,

---

[13] Ms. Mayo's prior salary was $42,000. (Mayo Application, ECF No. 103-71, at 4.) Her salary in the District at Step 3 was $47,350, or about 13% higher. (Mayo Notice of Hiring, ECF No. 103-70, at 1.)

at 46 (generally discussing that the District had found it difficult to hire candidate with hard science certifications).) The District also avers that Ms. Harmon was considered a "rock star" under the "Baker Guidelines" and hired her above-Step to secure her employment.[14] (*Id.* at 23.) The Defendant cites no record evidence for this apart from its own interrogatory answers, the Baker Affidavit, and the Johns Deposition. (*Id.*)

### 9.  Morgane Evans – Hired at Step 3

Morgane Evans was also hired in 2014 during Superintendent Baker's tenure. (*Id.* at 24.) Ms. Evans had five years of prior public-school teaching experience, was certified to teach French Grades K–12, and was hired at Step 3 as a "3/5 teacher" with a promise to be made a full-time teacher the following year. (*Id.*; Evans Resume, ECF No. 103-90, at 1.) The District asserts that Ms. Evans was also considered a "rock star" under the "Baker Guidelines" based on her interviews. (ECF No. 102, 24.) The Defendant cites no record evidence for this apart from its own interrogatory answers, the Baker Affidavit, and the Johns Deposition. (*Id.*) The District avers that it had to offer Ms. Evans Step 3 placement so that her salary would be commensurate with her prior salary.[15] (*Id.*)

### 10. Kattreena Amodeo – Hired at Step 3

Kattreena Amodeo was hired in 2014 during Superintendent Baker's tenure. (*Id.*) Ms. Amodeo had two years of prior public-school teaching experience and she held three certifications: Special Education Grades 1–12, Early Childhood Education Grades 1–3, and Elementary Education Grades K–6. (*Id.*; Amodeo Resume, ECF No. 103-95, at 1.) These certifications

---

[14] Ms. Harmon's prior salary was $39,268. (ECF No. 103-82, at 2.) Her salary in the District at Step 2 was $47,550, or about 21% higher. (Harmon Notice of Hiring, ECF No. 103-84, at 1.)

[15] Ms. Evans' former salary was $46,000. (ECF No. 103-86, at 1.) When the District hired her as a 3/5 teacher at Step 3, her salary was $29,070. (Evans Notice of Hiring, ECF No. 103-87, at 1.) Once she was made a full-time teacher, Ms. Evans' salary was $48,450, or about 5% higher than her former salary. (Evans Dep., ECF No. 111-3, at 22–23.)

ostensibly provided the District with flexibility in placing her. (ECF No. 102, at 24.) The District avers that Ms. Amodeo was also considered a "rock star" under the "Baker Guidelines" based on her interviews. (*Id.*) The Defendant cites no record evidence for this apart from its own interrogatory answers, the Baker Affidavit, and the Johns Deposition. (*Id.*) She was placed two steps higher than set forth in the Guidelines at Step 3. (*Id.*) The Defendant avers that this salary was intended to secure Ms. Amodeo's hiring and was commensurate with her previous salary.[16] (*Id.* at 24–25.)

### 11. Caryn Glassbrenner – Hired at Step 3

Caryn Glassbrenner was hired in 2014 during Superintendent Baker's tenure. (*Id.* at 25.) Ms. Glassbrenner had three years of prior public-school teaching in Virginia before she was hired at Step 3—two steps higher than set forth in the Guidelines. (*Id.*; Glassbrenner Resume, ECF No. 103-99, at 1.) The Defendant avers that it hired Ms. Glassbrenner above-Step because she held three certifications in Middle Level Mathematics 7–9, Elementary Education K–6, and Early Childhood Education N–3, which provided it with scheduling flexibility, and to ensure her pay was commensurate with her prior salary.[17] (*Id.*) The Defendant did not identify her as one of the "rock stars" under the "Baker Guidelines."

### 12. Alicia Schooley – Hired at Step 3

Alicia Schooley was hired in 2014 during Superintendent Baker's tenure. (ECF No. 102, at 25.) Ms. Schooley had five years of prior teaching experience, four of those were in public-school districts outside Pennsylvania and one was in a private school. (Schooley Dep., ECF No.

---

[16] Ms. Amodeo's previous salary was $41,735. (Amodeo Application, ECF No. 103-92, at 2.) Her salary in the District at Step 3 was $49,350, or about 18% higher. (Amodeo Notice of Hiring, ECF No. 103-93, at 1.)

[17] Ms. Glassbrenner's previous salary was about $44,000. (Glassbrenner Dep., ECF No. 103-101, at 3.) Her salary in the District at Step 3 was $48,450, or about 10% higher. (Glassbrenner Notice of Hiring, ECF No. 103-98, at 1.)

106-16, at 11–14.) Ms. Schooley was also a part-time substitute teacher in the District for two years prior to becoming a full-time teacher. (*Id.* at 17.) Ms. Schooley held a certification in Elementary Education Grades Pre-K–4. (Schooley Resume, ECF No. 103-106, at 3.) According to the District,  Ms. Schooley was also considered a "rock star" under the "Baker Guidelines" based on her interviews. (ECF No. 102, at 25.) However, the Defendant cites no record evidence for this apart from its own interrogatory answers, the Baker Affidavit, and the Johns Deposition. (*Id.*) She was placed one step higher than set forth in the Guidelines at Step 3. (*Id.*) The Defendant avers that salary was intended to secure Ms. Schooley's hiring and was commensurate with her previous salary.[18] (*Id.*)

### 13. Kaitlyn Robson – Hired at Step 2

Kaitlyn Robson was hired in 2015 during Superintendent Baker's tenure. (*Id.*) Ms. Robson had less than a year of teaching experience and held a certification in Biology Grades 7–12. (*Id.*; Robson Application, ECF No. 103-110, at 1–2.) The District says that Ms. Robson was also considered a "rock star" under the "Baker Guidelines" based on her interviews. (ECF No. 102, at 25–26.) Again, the Defendant cites no record evidence for this apart from its own interrogatory answers, the Baker Affidavit, and the Johns Deposition.[19] (*Id.*) She was hired at Step 2, one step higher than the Guidelines prescribed, in order to secure Ms. Robson's hiring.[20] (*Id.* at 26.)

---

[18] Ms. Schooley's previous salary was $38,000. (Schooley Application, ECF No. 103-102, at 3.) Her salary in the District at Step 3 was $49,350, nearly 30% higher. (Schooley Notice of Hiring, ECF No. 103-104, at 1.)

[19] There is some evidence from William Addy's deposition (uncited by the Defendant) that Ms. Robson had an excellent interview and demo lesson, which may have contributed to her above-Step hiring. (ECF No. 106-1, at 58:24–61:1.)

[20] Ms. Robson's previous salary was $38,500. (Robson Application, ECF No. 103-110, at 2.) Her salary in the District at Step 2 was $49,750, nearly 30% higher. (Robson Contract, ECF No. 103-107, at 1.)

### 14. Kaylee Stewart – Hired at Step 2

Kaylee Stewart was hired in 2015 during Superintendent Baker's tenure. (*Id.*) Ms. Stewart was certified in Chemistry Grades 7–12 and had one (1) year of teaching experience at a public school in Pennsylvania.[21] (Stewart Application, ECF No. 103-119, at 2–3; Stewart Resume, ECF No 103-121, at 1.) Ms. Stewart also had two months of work experience as a chemist for PPG Industries. (ECF No. 103-119, at 2.) Due to her certification and practical work experience, the District contends that Ms. Stewart was considered a "rock star" under the "Baker Guidelines." (ECF No. 102, at 26.) However, there is no record evidence that any administrators specifically identified Ms. Stewart as a "rock star" prior to hiring. Ms. Stewart was hired at Step 2, one step higher than the Guidelines prescribed, in order to ensure her hiring.[22] (*Id.* at 27.)

### 15. Katelyn Schulmeister – Hired at Step 2

Katelyn Schulmeister was hired in 2015 during Superintendent Baker's tenure. (*Id.*) Ms. Schulmeister held three certifications at the time she was hired in Elementary Education Grades K–6, Special Education Grades N–12, and Reading Specialist. (*Id.*; Schulmeister Application, ECF No. 103-125, at 1.) Ms. Schulmeister had one year of public-school teaching experience prior to the District hiring her, specifically with autistic kindergarteners. (ECF No. 102, at 27; Schulmeister Resume, ECF No. 103-126, at 1.) Additionally, Ms. Schulmeister had three years of prior work experience with special needs students at the D.T. Watson Institute, where she worked as a paraprofessional, a building substitute teacher, and a full-time teacher. (ECF No. 102, at 27;

---

[21] The Defendant's Motion states that Ms. Stewart was "certified to teach Chemistry, Earth Science, and Environmental Science." (ECF No. 102, at 26.) While her application only lists a chemistry certification, (ECF No. 103-119, at 1–2), Ms. Stewart testified that it enabled her to teach earth science and environmental science as well, (ECF No. 106-18, at 9–10.)

[22] Ms. Stewart's previous salary was $34,000. (ECF No. 103-119, at 3.) Her salary in the District at Step 2 was $47,750, about 40% higher. (Stewart Contract, ECF No. 103-116, at 1.)

Schulmeister Dep., ECF No. 106-17, at 10:8–14.) For all these reasons, the District says that Ms. Schulmeister was considered a "rock star" under the "Baker Guidelines." (ECF No. 102, at 27.) However, there is no record evidence that any administrators specifically identified Ms. Schulmeister as a "rock star" prior to hiring. Ms. Schulmeister was hired at Step 2, one step higher than the Guidelines prescribed, in order to ensure her hiring.[23] (*Id.*)

### 16. Bridgette (Dawson) Hinterliter – Hired at Step 2

Bridgette Hinterliter was hired in 2015 during Superintendent Baker's tenure. (*Id.*) Ms. Hinterliter held dual certifications in Special Education and Elementary Education and had one and a half years of public-school teaching experience in Virginia. (*Id.*; Hinterliter Interview Notes, ECF No. 103-131, at 3, 9.) Ms. Hinterliter also had experience in the Wilson Reading Program at a time that the Defendant avers the District was placing an emphasis on reading education. (ECF No. 102, at 27–28 (citing Hinterliter Interview Notes, ECF No. 103-131).) For all these reasons, Ms. Hinterliter was considered a "rock star" under the "Baker Guidelines." (*Id.* at 28.) However, there is no record evidence that any administrators specifically identified Ms. Hinterliter as a "rock star" prior to hiring. Her interview notes reflect overall high scores, ranging from Average (three out of five points) to Outstanding (five out of five points). (*See generally* ECF No. 103-131.) Ms. Hinterliter was hired at Step 2, one step higher than the Guidelines prescribed, in order to provide salary comparable to her prior position and ensure her hiring.[24] (ECF No. 102, at 28.)

---

[23] Ms. Schulmeister's exact previous salary is unknown. (Schulmeister Dep., ECF No. 106-17, at 29–30.) However, Ms. Schulmeister believed her $48,814 Step 2 salary was about $10,000 higher than her previous salary. (*Id.*)

[24] Ms. Hinterliter's previous salary was between $44,000 and $45,000. (Hinterliter Dep., ECF No. 124-10, at 16–17.) Her salary in the District at Step 2 was $48,814, at least 8% higher than her former salary but perhaps more. (Hinterliter Contract, ECF No. 103-128, at 1.)

### 17. Amber Graves – Hired at Step 8

Amber Graves was hired in 2015 during Superintendent Baker's tenure. (*Id.*) The Defendant states that Ms. Graves held certifications in both Elementary Art Grades K–6 and Reading Grades K–12. (*Id.*) However, her application listed three certifications—Elementary K–6, Early Childhood N–3, and Reading Specialist K–12. (Graves Application, ECF No. 103-132, at 1.) She also had sixteen and a half years of prior teaching experience both in Pennsylvania and out-of-state. (*Id.* (citing Graves Resume, ECF No. 103-133).) Her resume reflects ten-and-a-half years of experience as an elementary teacher and the remaining six years as a literacy coach/specialist. (ECF No. 103-133, at 1–2.)  In addition to her experience, Ms. Graves was also named Teacher of the Year. (*Id.* at 2.) Ms. Graves had discussions with Bill Addy, the District's human resources director, in order to obtain comparable salary to her former position. (ECF No. 102, at 28.) Ms. Graves was placed on Step 8 so that her salary would be commensurate with her previous position.[25] (*Id.*) She was also considered a "rock star" due to her "dual certification and vast experience." (*Id.*) Dr. Caroline Johns recalled that Ms. Graves had "really good depth in terms of reading instruction, and that was a pretty big need at the elementary level." (ECF No. 106-7, at 33:5–8.) However, there is no record evidence that administrators specifically identified Ms. Graves as a "rock star" prior to hiring.

### 18. Jennifer (LeGrand) Mattucci – Hired at Step 4

Jennifer (LeGrand) Mattucci was hired in 2015 during Superintendent Baker's tenure. (ECF No 102, at 29.) Ms. Mattucci held a certification in English Grades 7–12 and had seven years of prior public-school teaching experience. (Mattucci Offer Sheet, ECF No. 103-139; Mattucci

---

[25] Ms. Graves' previous salary was $63,000 for 220 days worked. (Graves Dep., ECF No. 124-6, at 19.) Her salary in the District at Step 8 was $54,974, but for fewer days. (*Id.* at 22–24.) Thus, the salary was roughly equivalent on a per-day basis. (*Id.*)

Resume, ECF No. 103-140, at 1.) Ms. Mattucci was also considered a "rock star" and the Defendant states Ms. Mattucci's experience in teaching writing came at a time that the District was emphasizing writing in its curriculum. (ECF No. 102, at 29.) Therefore, the District avers that she filled a special need within the District. However, the only piece of evidence that supports these claims is Ms. Mattucci's Formal Notice of Hiring, which states that she was hired specifically to be a Writing Teacher. (ECF No. 103-138.) Apart from this, the Defendant cites only Ms. Mattucci's resume, its own interrogatory answers, the Baker Affidavit, and the Johns deposition. (ECF No. 102, at 29.) Ms. Mattucci was placed at Step 4, one step higher than prescribed by the Guidelines, to ensure her hiring.[26] (*Id.*)

## III.   **DISCUSSION**

Both parties have moved for summary judgment. The Plaintiffs argue that no material fact has been effectively disputed by the Defendant and they are entitled to summary judgment under the EPA. The Defendant argues that it has proffered overwhelming undisputed evidence to support summary judgment in its favor. Neither is correct.

### A.  **Summary Judgment Standard**

Summary judgment will be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To withstand a summary judgment motion, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable factfinder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the Court may not weigh the evidence or make credibility determinations. *Id.*

---

[26] Ms. Mattucci's previous salary is unknown. Her salary in the District at Step 4 was $49,550. (Mattucci Contract, ECF No. 103-137, at 1.)

If the moving party carries its initial burden under Rule 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex*, 477 U.S. at 323). The non-moving party cannot rest on allegations in pleadings in attempting to survive summary judgment. *Id.* Rather, they must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998). Arguments made in court and in the parties' briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

The court is permitted to resolve cross-motions for summary judgment concurrently and the mere fact that both parties filed summary judgment motions does not necessarily mean there are or are not genuine issues for trial. *InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d 230, 235 (M.D. Pa. 2004) (describing concurrent resolution of cross-motions for summary judgment as "a formidable task"); *see also Irvin v. United Mine Workers of Am. Health & Ret. Funds*, No. 05–1072, 2007 WL 539646, at *1 (W.D. Pa. Feb. 15, 2007); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (4th ed. 2019). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. *Johnson v. Fed. Exp. Corp.*, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014), *aff'd*, 604 F. App'x 183 (3d Cir. 2015) (citing *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3d Cir. 1990)).

### B. Analysis

The EPA prohibits employers from paying different wages for substantially equal work on the basis of sex. 29 U.S.C. § 206(d). Unlike Title VII and age discrimination claims, which most often adhere to the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the EPA framework follows a two-step process. *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000).

In the first step, as applied to the allegations in this case, the Plaintiffs must establish a *prima facie* case by demonstrating that female teachers were paid more while performing "equal work." *Id.* "Equal work" means that of "substantially equal skill, effort and responsibility, under similar working conditions." *Id.* (citing *E.E.O.C. v. Del. Dept. of Health and Soc. Servs.*, 865 F.2d 1408, 1413–14 (3rd Cir. 1989) ["*Del. HSS*"]).

In the second step, the burden shifts to the Defendant-employer to demonstrate that one of the four affirmative defenses listed in the EPA applies.[27] *Id.* The Defendant's affirmative defense advanced here falls under the fourth, catch-all defense—the pay differentials were based on factors other than sex. (ECF No. 125, at 7); *see* 29 U.S.C. § 206(d)(1). The Defendant's burden is one of ultimate persuasion. *Stanziale*, 200 F.3d at 107.

#### 1. The Defendant's Motion for Summary Judgment

In order to prevail at the summary judgment stage, the Defendant must prove its affirmative defense "so clearly that no rational jury could find to the contrary." *Id.* (quoting *Del. HSS*, 865 F.2d at 1414). In meeting this burden, the Defendant must show that its proffered gender-neutral reasons "*do in fact* explain the wage disparity." *Id.* at 108 (emphasis in original). Thus, the Defendant "must produce sufficient evidence such that no rational jury could conclude but that the

---

[27] Those affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; and (4) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1).

proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Id.* That is, it is not enough to show gender-neutral reasons which *could* explain differences in pay. *Id.* The Defendant must present evidence conclusively proving that the pay differences were *in fact* motivated by those reasons. *Id.*

### a. **Step One – *Prima Facie* Case**

The Defendant appears to challenge the Plaintiffs' *prima facie* cases under step one of the EPA framework. The Defendant argues that the Plaintiffs' chosen comparators are inapposite because no Plaintiff "can point to any Above-Step comparator hired in their respective year of hire with whom they possess the same level of prior qualifying experience or certifications." (ECF No. 102, at 9.) Essentially, the Defendant argues that the Plaintiffs are unable to make an "apples to apples" comparison sufficient to support their *prima facie* cases. (*Id.*) The Defendant points out that only Jason Persing and Joseph Espey were hired during a year that there were any female comparators hired above-Step.[28] (*Id.* at 10.)

This "apples to apples" argument is salient, according to the Defendant, because the hiring exigencies of each school year vary. (*Id.*) They include "retirements, market demands, new District programs, and other changing needs of the District." (*Id.*) Therefore, according to the Defendant, comparing a Plaintiff hired in 2005 with a comparator hired in 2010 will not clearly demonstrate that male teachers were treated differently on the basis of sex. (*Id.*) Further, the Defendant argues that to permit such comparisons under the EPA would have the effect of preventing employers from making hiring decisions in response to "changing markets and changes in personnel." (*Id.*)

---

[28] The Defendant hired both Espey and Persing for the 2005–06 school year. *See supra* Parts II.B.3, 8. The only above-Step female comparator hired that same year is Amy Pannebaker. *See supra* Part II.C.3. She had more public-school teaching experience than Espey and Persing. *See supra* Parts II.B.3, 8; II.C.3.

However, this challenge to the Plaintiffs' *prima facie* cases does not address the actual *prima facie* elements. *See Stanziale* 200 F.3d at 107. Under the standard articulated by our Court of Appeals, the Plaintiffs must show: (1) employees of the opposite sex (2) were paid differently (3) for equal work. *Id.* The Defendant does not challenge that the comparators are women or were paid more, since they cannot.

However, their "apples to apples" argument does not go to the "equal work" element either. "Equal work" means "work of substantially equal skill, effort and responsibility, under similar working conditions." *Id.* The "crucial finding" here is whether the jobs to be compared have a "common core of tasks," meaning a significant portion of the jobs are identical. *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985). The focus of this inquiry must be on the skills necessary to perform the job, not on a comparison of the individual abilities of the plaintiffs and comparators. *Puchakjian v. Twp. of Winslow*, 804 F. Supp. 2d 288, 295 (D.N.J. 2011), *aff'd*, 520 F. App'x 73 (3d Cir. 2013).

Here, the Plaintiffs and comparators are all teachers certified by the Pennsylvania Department of Education. (Pls.' Concise Statement of Material Facts, ECF No. 105, at 24.) As one might expect, they all teach students and evaluate them or give grades. (*Id.* at 25.) They are all expected to create lesson plans and conduct parent-teacher conferences. (*Id.* at 24.) They all attend open-houses or orientations, or both. (*Id.* at 25.) And, teachers in the District are not paid differently based on the subject matter they teach. (*Id.*) An elementary art teacher and a high school science teacher hired at the same Step and Lane would have the same salary. In other words, the District (and likely its teachers' union in the collective bargaining process) have decided that when it comes to pay rates, a teacher is a teacher is a teacher.

26

Neither in its briefs nor at oral argument did the Defendant challenge the "equal work" element. Instead, the Defendant cites persuasive authority to argue that "plaintiffs cannot establish a prima facie case of a violation of the [Equal Pay] Act where they fail to identify applicable comparators."[29] (ECF No. 102, at 10–11.) This is, of course, true as far as it goes. However, whether comparators are "applicable" turns on them being the opposite sex, paid more, and doing substantially equal work. *Stanziale*, 200 F.3d at 107. It does not require being hired in the same year by the same administrators applying their then-current hiring and pay philosophy. And in any event, as set out at length below, the Defendant's "proof" as to the factors it says should go into its definition of "apples to apples" is rife with evidentiary gaps and uncertainty, and is anything but conclusive, as it would have to be for summary judgment to be granted in its favor.

This is not to say that year-to-year exigencies are irrelevant. The issue could be relevant to an affirmative defense that differences in pay were not motivated by sex. However, for these

---

[29] The Defendant cites caselaw from the Fourth Circuit and the District of South Carolina. (ECF No. 102, at 10–11.) *Houck v. Virginia Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206 (4th Cir. 1993), affirmed the dismissal of an EPA claim because the plaintiff only identified a hypothetical comparator, rather than an actual one. Further, the portion of the opinion the Defendant quotes is dicta comparing the EPA to Title VII. *Id.* at 206–07. *Woodward v. United Parcel Serv., Inc.*, 306 F. Supp. 2d 567 (D.S.C. 2004) involves a Title VII pay discrimination claim. For these reasons, the Court declines to apply the reasoning of these two cases.

The Defendant cited the Ninth Circuit as well, which wrote, "a comparison to a specifically chosen employee should be scrutinized closely to determine its usefulness." *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983). The court took issue with the EPA plaintiff choosing one single employee, despite many other available comparators, because he was the highest-paid. The court wrote that the "proper test for establishing a prima facie case . . . is whether the plaintiff is receiving lower wages than the *average of wages paid to all employees* of the opposite sex performing substantially equal work and similarly situated." *Id.* (emphasis added). The *Hein* Court applied the reasoning from an Eighth Circuit Title VII equal pay case to the EPA in establishing this rule. *See Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 117 (8th Cir. 1981). The court reasoned that this interpretation of the EPA recognizes that "wage variations may stem from a multitude of factors that do not implicate sex discrimination." *Hein*, 718 F.2d at 916. Further, it held that this reading is consistent with the fact that the EPA only refers to "employees" in the plural form. *Id.* To the Court's knowledge, this rule has almost never been adopted in this Circuit. To the contrary, several District Courts in this Circuit have held that a plaintiff may elect one, single comparator if they so choose. *See infra* Part III.B.2.b. The Court found only one case in this Circuit that followed the *Hein* rule, ostensibly because the rule was proffered by the defendant and the plaintiff failed to rebut it. *Lemke v. Int'l Total Servs., Inc.*, 56 F. Supp. 2d 472, 490 (D.N.J. 1999). The opinion was summarily affirmed by the Circuit without a written opinion. 225 F.3d 649 (3d Cir. 2000). Here, the Defendant does not argue that the "average wages" rule should be applied. For these reasons, the Court declines to apply *Hein*.

reasons and viewing the evidence in the light most favorable to the Plaintiffs, the Court concludes that the Defendant has failed to demonstrate as a matter of law that the Plaintiffs have advanced no *prima facie* cases. For the reasons noted above and below, in all but two cases, the Plaintiffs demonstrably have.

    **b.   Step Two – Affirmative Defense**

The EPA contains four (4) statutory affirmative defenses. 29 USC § 206(d)(1). The Defendant invokes the fourth, catch-all defense— "a differential based on any other factor other than sex." *Id.* If the Defendant demonstrates that such applies as a matter of law, they'd have a winner at this stage of the proceedings. It hasn't, so it doesn't.

As discussed in Part II.C, *supra*, the Defendant proffers various non-sex-related reasons for differentials in salary. Because an employer bears the burden of proof at an EPA trial once the Plaintiff has made out a *prima facie* case, in order to prevail on summary judgment, the Defendant must prove its affirmative defense "so clearly that no rational jury could find to the contrary." *Stanziale*, 200 F.3d at 107 (quoting *Del. HSS*, 865 F.2d at 1414). As previously discussed, the Defendant cannot merely proffer evidence for reasons that *could* explain a wage disparity. They must substantiate that the proffered reasons "*do in fact explain*" or "*actually motivated*" the disparity. *Id.* at 108 (emphasis added). The Court finds and concludes that the Defendant has not met this burden.

The comparators held various qualifications at the time of hiring that the Defendant claims were part of the reason for above-Step placement. Many comparators had several years of prior teaching experience and were certified in multiple subjects, some of which were characterized as hard to find.[30] Some had valuable experience outside of the District, like working for the National

---

[30] *See supra* Part II.C.

Science Foundation, (ECF No. 103-48, at 1), or as a chemist for PPG Industries, (ECF No. 103-119, at 2). An overall review of the Record indicates that the female comparators held an abundance of accolades and experience.

Furthermore, the Defendant proffered legitimate, nondiscriminatory business reasons for why a comparator may have been or could have been hired above-Step.[31] For instance, a comparator's qualifications and certifications may have met the District's pressing hiring needs or provided it with flexibility in placement. Some comparators were allegedly able to negotiate higher salaries or were offered more money to attract them to the District. Others were hired at a time when the District had to quickly fill a large number of vacancies or there was a particularly pressing vacancy. Some comparators came with recommendations from other District employees. Many of them were described as "rock stars" under the "Baker Guidelines." In one instance, a teacher was supposedly hired above-Step for morale purposes to match the salary of another recent hire in the same department.

However, a problem arises when the Court examines the actual record evidence. As discussed at length in Part II.C, *supra*, and viewed here in the light most favorable to the Plaintiffs, there is not enough evidence at the summary judgment stage to prove that any of these nondiscriminatory reasons *actually motivated* the above-Step placements. The *Stanziale* Court's assessment of its case exactly reflects the issue here:

> We have already noted several factors that appellees have proffered which *could* explain the wage disparity, and we have no doubt that [the comparator's] educational qualifications fall within the meaning of the fourth affirmative defense, "a differential based on any factor other than sex." What is missing in this record, however, is some evidence that demonstrates that the decision to pay [the comparator] a starting salary of $2,000 more than plaintiff was *in fact* made pursuant to these qualifications. Because it was [the employer's] burden to establish this fact so clearly that no rational

---

[31] *See id.* for citations to the Record for the reasons discussed in this paragraph.

> jury could find to the contrary, the grant of appellees' motion for
> summary judgment as to the Equal Pay Act . . . is error.

*Stanziale*, 200 F.3d at 108 (emphasis in original) (citations and quotations omitted). The Record here reflects a busload of similarly nondiscriminatory reasons that *could* in theory explain the Step disparities. However, there is little to no direct or inferential evidence that any administrators or School Board Directors were *actually motivated* to recommend hiring or to hire the comparators above-Step *because*: (1) they were specially qualified; (2) they had desirable experience; (3) the District needed flexibility in placement; (4) the District was facing a pressing need at the time; (5) the District needed to quickly fill vacancies; (6) the comparator negotiated; or (7) the comparator indicated she would not accept unless given commensurate salary.[32] Instead, the Defendant's evidence largely sets up an *ex post facto* argument for a wide array of assertedly nondiscriminatory justifications. *Stanziale* and others instruct that this simply will not pass the test.[33] And as noted above, no current or former School Board member, that is those who would have voted on the new hires, has any current memory or recollection of why any particular teacher was placed on the given Step at the time of hire. The long and the short of it is that, try as it might, the District cannot carry its burden to demonstrate that it has a sure winner as to any Plaintiff by passing out an exhaustive series of "might have beens."

In sum, the Defendant has not shown that a jury could only find in its favor with respect to the Plaintiffs' *prima facie* cases. Instead, the Record demonstrates that the Plaintiffs will be able

---

[32] This lack of direct evidence is discussed in more depth in the Court's Statement of the Facts, Part II.C, *supra*. One puzzling aspect of the Defendant's "matching salary" justification for many above-Step hires is that the salary that the District paid to a number of the comparators outpaced their salary in their prior position by 30% to 40%. It will be up to a jury to decide if that is a "match" or something else.

[33] By way of contrast, the court in *Dorsey v. The Salvation Army* granted a defendant's summary judgment motion where its human resources director testified to her *first-hand knowledge* that the salary decisions were made for nondiscriminatory reasons. No. CIV.A. 04-844, 2005 WL 181912, at *4 (E.D. Pa. Jan. 27, 2005).

to meet the first prong of their claims. Further, while the Court concludes that there is sufficient circumstantial evidence to defeat the *Plaintiffs'* Motion for Summary Judgment, as discussed below, the Defendant has not proven its affirmative defense as a matter of law. For these reasons, the Defendant's Motion for Summary Judgment will be denied.

### 2. *The Plaintiffs' Motion for Summary Judgment*

The analysis of the Plaintiffs' Motion for Summary Judgment follows the same two-step framework as above. First, the Plaintiffs must establish their *prima facie* cases. Second, they must show that the Defendant cannot prove its affirmative defense as a matter of law. In this instance, the evidence is viewed in the light most favorable to the Defendant.

### a. **Step One – *Prima Facie* Cases**

While the Third Circuit has observed that "[g]iven the fact intensive nature of the [*prima facie*] inquiry, summary judgment will often be inappropriate," *Brobst*, 761 F.2d at 156, the fact analysis here is straightforward. The facts which go to the Plaintiffs' *prima facie* cases are essentially undisputed. The Plaintiff must show that "employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." *Stanziale*, 200 F.3d at 107. The Defendant's only rebuttal (which is found in their own Motion for Summary Judgment, not in their Response to the Plaintiffs' Motion) is that the comparators were not hired in the same year. (ECF No. 102, at 9–12.) As discussed, this argument is more appropriately directed to the Defendant's affirmative defense and really has nothing to do with the *prima facie* cases, which go to whether employees are paid equally for equal work, not to the moment in time in which they are hired.[34] The Defendant

---

[34] At oral argument, the Court quizzed counsel about what appears to be the reality that no matter how/when teachers were hired, a central question is whether today, right now, teachers of opposite sexes were paid different amounts for doing "equal" work under the EPA. The Court never really got an answer to that reality, as the lawyers seemed to be laser-focused on pay decisions made at the time of hire, not whether there was an EPA violation here and now. It is

does not argue that comparators had different responsibilities or necessary skills or that "differing or additional tasks make the work substantially different." *Puchakjian*, 804 F. Supp. 2d at 294–95. The Court also concluded that, for the purposes of the Defendant's Motion, the Plaintiffs and comparators performed substantially equal work. However, viewing that same evidence in the light most favorable to the Defendant, the Record still substantiates the Plaintiffs' *prima face* cases for purposes of their Motion. All District teachers are certified by the state, teach students, evaluate them or give grades, create lesson plans, conduct parent-teacher conferences, attend open-houses and/or orientations, and they are not paid differently based on the subject matter they teach. (ECF No. 105, at 24–25.) For these reasons and given that the Defendant has failed to show any disputes of fact in such regards, the Court concludes that the Plaintiffs have satisfied the first step of their EPA claim—with two exceptions.

First, Plaintiff Christopher D'Eramo lists several comparators that were hired at Step 2. In their Motion for Summary Judgment, the Plaintiffs aver that Mr. D'Eramo was hired at <u>Step 1.5</u>. (ECF No. 114, at 5.) In support of this, the Motion cites to the Plaintiff's Concise Statement of Material Facts, (ECF No. 105, ¶ 109), which in turn cites to the Amended Complaint, (ECF No. 6, ¶ 23). Neither filing provides any evidence for the assertion that Mr. D'Eramo was hired at Step 1.5. In fact, there is record evidence to the contrary. Mr. D'Eramo's formal notice of hiring stated that his salary "will be Bachelors Step 2 $40,375.00 and will be prorated from start date through the last day of school of the 2006-07 school year." (ECF No. 103-32.) The notice was dated January 29, 2007. (*Id.*) Thus, viewing the evidence in the light most favorable to the Defendant, it appears that Mr. D'Eramo was not hired at Step 1.5. He was hired at Step 2 prorated to begin midway

---

plausible that the fact that a comparator remains ahead of a Plaintiff on the pay scale to this day would be the result of the application of a bona fide seniority system, if the original hiring differential was lawful for EPA purposes, but neither party has said that to the Court.

through the academic year. Accordingly, Mr. D'Eramo has not conclusively demonstrated his *prima facie* case with respect to the proffered comparators who were *also* hired at Step 2, although there is sufficient evidence in the Record to support the inference that he may be able to do so at trial.

Second, Plaintiff Timothy Hrivnak was hired at Step 2 after five years of teaching experience. Part II.B.6. In the Plaintiffs' Motion, he proffers Jennifer Mattucci and Amber Graves as comparators, who were hired at Step 4 and 8, respectively. (ECF No. 114, at 15.) Plaintiffs aver that these comparators' Steps demonstrate that the District "hired female teachers above Step 3, thereby treating them more favorably than Plaintiff Hrivnak." (*Id.*) However, while they do evidence that the Defendant deviated from the Guidelines, both comparators had seven or more years of teaching experience. *See* Parts II.C.17–18. They were thus entitled to Step 3 placement under the Guidelines. Therefore, there is a jury question as to whether Ms. Mattucci and Ms. Graves are appropriate comparators for Plaintiff Hrivnak, who was only entitled to Step 2 placement.

### b. Step Two – Affirmative Defense

In the second step, the Plaintiffs must show that the Defendant cannot bear its burden of proof for its affirmative defense. The Defendant may rebut this by identifying specific facts which demonstrate that there exists a genuine issue for trial as to that affirmative defense.

The Plaintiffs contend that they only need to show they were paid differently with respect to a *single* employee of the opposite sex. (ECF No. 114, at 6 (citing *Mulhall v. Advance Sec. Inc.*, 19 F.3d 586, 590 (11th Cir. 1994), *cert denied*, 513 U.S. 919 (1994); *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1033 n.10 (11th Cir. 1985); *Dubowsky v. Stern, Lavinthal, Norgaard and Daly*, 922 F. Supp. 985, 990 (D.N.J. 1996).) At least two other courts within this

circuit have said just that. *Ryan v. Gen. Mach. Prod.*, 277 F. Supp. 2d 585, 596 (E.D. Pa. 2003) (citing *Mulhall* and *Dubowsky*); *Hodgkins v. Kontes Chemistry & Life Scis. Prod.*, No. CIV. A. 98-2783, 2000 WL 246422, at *15 (D.N.J. Mar. 6, 2000).[35] Given that under this approach, the Plaintiffs only have to present a single valid comparator, summary judgment could be granted where the Defendant is unable to meet its burden as to any one comparator. In their Motion, the Plaintiffs individually proffered their comparators. (*See* ECF No. 114, at 7–19.) Comparators were chosen if they had the same or less prior public-school teaching experience, but were nonetheless placed on a higher Step. (*Id.*) The following tables present the comparators for which the Plaintiffs have satisfied their *prima facie* cases:

| Plaintiff Barry Barthelemy – Step 1 | |
|---|---|
| **Comparators** | **Step Level** |
| Nancy Burgunder | 2 |
| Caryn Glassbrenner | 3 |
| Melissa Mayo | 3 |
| Kattreena Amodeo | 3 |
| Bridgette Hinterliter | 2 |
| Sarah Durham | 2 |
| Megen Harmon | 2 |
| Kaitlyn Robson | 2 |
| Katelyn Schulmeister | 2 |
| Kaylee Stewart | 2 |

**Table 1**

| Plaintiff Christopher D'Eramo – Step 2 | |
|---|---|
| **Comparators** | **Step Level** |
| Amy Pannebaker | 3 |
| Caryn Glassbrenner | 3 |
| Melissa Mayo | 3 |
| Kattreena Amodeo | 3 |

**Table 2**

---

[35] Alternatively, there is the Ninth Circuit's rule in *Hein*. 718 F.2d at 916. That court held "the proper test for establishing a prima facie case in a professional setting . . . is whether the plaintiff is receiving lower wages than the average of wages paid to all employees of the opposite sex performing substantially equal work and similarly situated." *Id.* The Court declines to adopt this rule for the reasons stated previously. *See supra* note 29.

| Plaintiff Joseph Espey – Step 1 | |
|---|---|
| **Comparators** | **Step Level** |
| Nancy Burgunder | 2 |
| Caryn Glassbrenner | 3 |
| Melissa Mayo | 3 |
| Kattreena Amodeo | 3 |
| Bridgette Hinterliter | 2 |
| Sarah Durham | 2 |
| Megen Harmon | 2 |
| Kaitlyn Robson | 2 |
| Katelyn Schulmeister | 2 |
| Kaylee Stewart | 2 |

**Table 3**

| Plaintiff Jason Ferri – Step 3 | |
|---|---|
| **Comparators** | **Step Level** |
| Jennifer Mattucci | 4 |
| Amber Graves | 8 |

**Table 4**

| Plaintiff Christopher Herman – Step 1 | |
|---|---|
| **Comparators** | **Step Level** |
| Kattreena Amodeo | 3 |
| Sarah Durham | 2 |
| Bridgette Hinterliter | 2 |
| Megen Harmon | 2 |
| Kaitlyn Robson | 2 |
| Katelyn Schulmeister | 2 |
| Kaylee Stewart | 2 |

**Table 5**

| Plaintiff Timothy Hrivnak – Step 2 | |
|---|---|
| **Comparators** | **Step Level** |
| Morgane Evans | 3 |
| Kattreena Amodeo | 3 |
| Caryn Glassbrenner | 3 |
| Melissa Mayo | 3 |
| Amy Pannebaker | 3 |
| Julie Rudi | 3 |
| Alicia Schooley | 3 |

**Table 6**

| Plaintiff Eric Jacoby – Step 1 ||
| Comparators | Step Level |
|---|---|
| Adrianne Kaminsky | 2 |
| Melissa Sebastian | 3 |

**Table 7**

| Plaintiff Jason Persing – Step 1 ||
| Comparators | Step Level |
|---|---|
| Nancy Burgunder | 2 |
| Caryn Glassbrenner | 3 |
| Melissa Mayo | 3 |
| Kattreena Amodeo | 3 |
| Bridgette Hinterliter | 2 |
| Sarah Durham | 2 |
| Megen Harmon | 2 |
| Kaitlyn Robson | 2 |
| Katelyn Schulmeister | 2 |
| Kaylee Stewart | 2 |

**Table 8**

| Plaintiff Sidney Wood – Step 1 ||
| Comparators | Step Level |
|---|---|
| Kattreena Amodeo | 3 |
| Sarah Durham | 2 |
| Bridgette Hinterliter | 2 |
| Megen Harmon | 2 |
| Kaitlyn Robson | 2 |
| Katelyn Schulmeister | 2 |
| Kaylee Stewart | 2 |

**Table 9**

As discussed, the Defendant urges that its hiring practices were based on factors other than sex. 29 U.S.C. § 206(d). The Plaintiffs argue that, while the Defendant has proffered a wealth of *post hoc* nondiscriminatory justifications, not a single person can testify nor can any record evidence demonstrate that those justifications actually motivated the District's salary decisions at the time of hire. The Plaintiffs appear to be correct in that regard in terms of direct evidence, that is testimony or business records based on first-hand knowledge that unequivocally sets forth a specific hiring rationale for each Plaintiff and comparator. An examination of the District's

personnel files and deposition testimony demonstrates little to no direct evidence that the proffered nondiscriminatory factors were the motivation in-fact. *See Stanziale*, 200 F.3d at 108. However, when a *plaintiff* files a summary judgment motion, "the summary judgment standard requires only that [d]efendants point to record evidence that creates a genuine issue of material fact as to whether factors other than sex explain the pay differential." *Hersh v. Manufacturers & Traders Tr. Co.*, No. CV 14-6709, 2016 WL 3059389, at *12 (E.D. Pa. May 31, 2016) (citing Fed. R. Civ. P. 56(a), (c)(1); *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007)); *see also Day v. Bethlehem Ctr. Sch. Dist.*, No. CIV.A. 07-159, 2008 WL 2036903 (W.D. Pa. May 9, 2008) (discussed *infra*). As discussed below, the deposition testimony, the personnel records, and hiring data which the Court is authorized (if not required) to consider under Fed. R. Civ. P. 56 present a jury question with respect to each of the comparators.

     i.   *Answers to Interrogatories*

At the outset, the Court notes that it will not take into consideration the Defendant's own interrogatory answers. "It is well-established that Rule 56 obliges the nonmoving party seeking to defeat a motion for summary judgment to go beyond the pleadings and by her own affidavits, or by the depositions, *answers to interrogatories*, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Malibu Media, LLC v. Doe*, 82 F. Supp. 3d 650, 652 (E.D. Pa. 2015) (emphasis added) (citing *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(c)). However, the Plaintiffs argue that School Board President Jerry Testa, who verified the Answers to the Plaintiffs' Second Set of Interrogatories, testified in his deposition that he had no personal knowledge about the relevant salary decisions. (ECF No. 114, at 22.) Thus, the Defendant cannot rely on these "self-serving" Answers because they are not based on any personal knowledge and represent only his "belief or opinion." (*Id.* (citing *Javornick v. UPS, Inc.*, No. 07-0195, 2008 WL

4462280, at *3 (W.D. Pa. Sept. 29, 2008).) The *Javornick* case addressed a conclusory affidavit, which was not based on personal knowledge. *Javornick*, 2008 WL 4462280, at *3 (citing *Maldonado v. Ramirez*, 757 F.2d 48, 50–51 (3d Cir. 1985)).

Other Circuits have held that interrogatory answers can be subject to the same infirmities as affidavits and thus "should be accorded no probative force where they are not based upon personal knowledge or are otherwise deficient." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990); *see also H.B. Zachry Co. v. O'Brien*, 378 F.2d 423, 425 (10th Cir. 1967). Accordingly, they should "be given effect so far as they are admissible under the rules of evidence." *Garside*, 895 F.2d at 49; *see also Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir. 1994) (holding that affidavits in support of summary judgment can be opposed by any *admissible* evidence contained in answers to interrogatories). Thus, it must be determined whether the interrogatory answers are based on Mr. Testa's personal knowledge or that of another witness who is able to testify with that foundation of their testimony.

However, it is difficult to draw that conclusion given that the verification statement reads, "I, Jerry S. Testa, . . . have read the foregoing Answers . . . [and] [t]he statements therein are correct to the best of my personal knowledge *or* information and belief." (ECF No. 103-1, at 23 (emphasis added).) The latter will not suffice, as explained by the Court of Appeals for the Fourth Circuit:

> [A]nswers to interrogatories used to oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. The personal knowledge requirement *prevents statements in affidavits that are based, in part, upon information and belief—instead of only knowledge—from raising genuine issues of fact sufficient to defeat summary judgment.*

*Burwick v. Pilkerton*, 700 F. App'x 214, 216 (4th Cir. 2017) (alteration in original) (emphasis added) (citations and quotation marks omitted) (citing *Pace v. Capobianco*, 283 F.3d 1275, 1278

(11th Cir. 2002)). Of particular salience to the issues of this case is the Defendant's answer to Plaintiffs' interrogatory nine—"[f]or each individual identified in the chart below, please identify the step on which she was hired by the District and explain the reason Defendant hired her on that particular step." (ECF No. 103-1, at 2.) The Answer begins, "as best as can be presently determined" and does not cite any depositions or affidavits, with the exception of the Baker Affidavit, which as noted above is of only modest, if any, evidentiary value. (*Id.* at 2–13.) Consequently, there is no basis to conclude that this interrogatory answer or any others are based on Mr. Testa's personal knowledge, that they can be reduced to admissible testimony, or that they are or can be presented as being admissible. Considered most charitably, those answers boil down to something akin to "we're not sure why what was done was done, but here are several likely reasons." That simply does not cut it as being admissible evidence that could create a genuine issue for a trial. That being the case, the Court concludes that it cannot consider the Defendant's own interrogatory answers for the purposes of assessing Plaintiffs' summary judgment motion.

*ii.*    *Depositions and Other Evidence*

The Defendant argues that there is sufficient circumstantial evidence in the Record from which a rational jury could find in its favor. The Defendant may present affirmative circumstantial evidence to defeat a motion for summary judgment, so long as it is "more than a scintilla." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Anderson*, 477 U.S. at 251). However, the Court cannot make inferences from the circumstantial evidence based on speculation or conjecture. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment"). The considerable record evidence here is plainly more than a scintilla. The question remains whether the evidence presents a dispute of material fact or whether

it only provides a basis for speculation, rank or otherwise. All in all, this is no simple task in this case.[36] While the Plaintiffs are correct that summary judgment cannot be defeated with speculation, contrary to the necessary implication of their argument, that is that direct evidence is required in an EPA case, a genuine issue of material fact can be created by record evidence that permits a reasonable inference that would support the non-moving party's position.

First, the Defendant has provided admissible evidence of its routine hiring and salary practices. *See* Fed. R. Evid. 406. There is evidence that the District used unwritten guidelines in order to place teachers with prior teaching experience into a Step and Lane. (ECF No. 101, at 2.) There is evidence that administrators conducted interviews with candidates and made hiring and salary recommendations to the School Board, which would then vote to hire the recommended candidates. (ECF No. 125, at 5.) The Defendant does not dispute that School Board members do not know why certain teachers were placed above-Step. (*Id.*) However, the Defendant does argue that when administrators made recommendations for above-Step placements, the reasons for doing so were routinely explained to the School Board in executive session. (*Id.* at 6.) While none of the Directors recall those reasons, the Defendant argues that this does not negate the nondiscriminatory business reasons documented in the Record. (*Id.*) It is also supported that, in making recommendations, the administrators had some degree of discretion. (*See e.g.* Addy Dep., ECF No. 106-1, at 29:15–25 (discussing salary latitude to attract candidates); Rondinelli Dep., ECF No. 106-13, at 18:14–16 (discussing the ability to "deviate" from budget guidelines to hire someone); Baker Aff., ECF No. 103-9 (discussing differing hiring philosophy).) Barring the salary

---

[36] As the Third Circuit once observed, "[w]hether the quantum of circumstantial evidence in any particular case is enough to meet the *Liberty Lobby* standard sometimes requires us to make difficult, fact-specific, perhaps somewhat arbitrary judgments." *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 461 (3d Cir. 1989).

recommendation being significantly above the Guidelines, a School Board member might not even question it. (ECF No. 125, at 6 (citing Testa Dep., ECF No. 126-1, at 87–88).)

Further, there is record evidence of other factors beyond just the years of public-school teaching experience that were taken into account when placing candidates on a certain Step. Bill Addy, the District's HR Director, testified that the District would assess a candidate's "knowledge, . . . skills[,] . . . abilities and what they bring to the table in terms of professionalism and experience." (ECF No. 106-1, at 71:9–14; *see also* ECF Nos. 106-13, at 50:1–7; 106-19, at 85:9–11.) He also testified that the District would look to a candidate's "salary scale, what they were making at their losing district," because the District "didn't want anybody to be harmed coming to the District." (ECF No. 106-1, at 29:15–25.) So, the District would "round up, if necessary, to give them the credit so that they would make just a little bit more to come to the District." (*Id.* at 29:15–25, 30:8–14, 31:12–16 (discussing paying commensurate salary); *see also* ECF No. 106-7, at 36:1–5 (same).) Dr. Bille Rondinelli testified that "there were times that if we really needed somebody, you could deviate a little bit from [budget guidelines]."[37] (ECF No. 106-13, at 18:14–16.) There is also substantial record evidence that the District would favorably consider or had difficulty finding certifications in certain subjects, such as music, special education, foreign languages, sciences, and math. (ECF No. 106-1, at 46:13–21; Hauser Dep., ECF No. 106-6, at 46:15–21; Limbruner Dep., ECF No. 106-8, at 19:1–11; Milanovich Dep., ECF No. 106-11, at 59:24–60:1; Scappe Dep., ECF No. 106-15, at 25:8–12, 47:25–48:6; Zangaro Dep., ECF No. 108-1, at 19:22–20:1, 31:5–12.)

---

[37] The Plaintiffs cite cases to argue that a candidates ability to negotiate and matching prior salary are not valid defenses. (ECF No. 114, at 20–22.) However, the cases cited essentially all reinforce the proposition that such evidence, if insufficiently supported, is not enough to grant a *defendant's* summary judgment motion. However, those defenses can be considered to defeat a plaintiffs summary judgment motion if the defendant raises a genuine issue of material fact in regards to those defenses, and nothing in the Court's Opinion is inconsistent with the cases cited. And as noted above, the degree to which some comparators were paid above their prior compensation level was seemingly quite substantial, and perhaps not as Mr. Addy described "just a little bit more." A jury will have to figure out what to make of that.

There is evidence that the District would likewise take a candidate's multiple certifications into account in hiring because it would provide certain flexibility in scheduling. (ECF No. 108-1, at 72:13–73:2 (discussing Melissa Mayo's hiring).) This evidence suggests that the District occasionally took factors other than public-school teaching experience into account when making hiring decisions and, by reasonable inference, when deciding a Step placement. Whether it did or didn't in a specific case would be for a jury to figure out.

There is additional deposition testimony that, while the Guidelines usually did not take non-public-school teaching into consideration, parochial or private school teaching experience was "considered" and "reviewed." (ECF Nos. 106-10, at 19:8–20; 108-1, at 18:11–13.) Thus, viewed in the light most favorable to the Defendant, a jury could conclude that such private school teaching experience was taken into consideration for certain comparators. Further, long-term substitute teaching may have been credited as well. (ECF Nos. 108-1, at 34:1–12; 106-13, at 59:7–24.) Ron Zangaro testified that long-term substitute experience was considered, but that day-to-day substitute experience was not "necessarily" considered. (ECF No. 108-1, at 34:1–12.) However, Dr. Rondinelli testified that if a candidate "had substituted in the District or if [they] had *done some type of work or experience* within the District, credit was typically given for that." (ECF No. 106-13, at 25:3–6 (emphasis added).) A candidate with prior experience as a substitute in the District would be "highly desired" because they would "know the schedules" and "what was needed within the District." (*Id.* at 45:10–14.) Viewing the evidence in the light most favorable to the Defendant, a jury could conclude based on this testimony that long-term *and* day-to-day substitute teaching within the District was occasionally credited. It would be the province of a jury to decide if it was in fact credited in a given situation.

The evidence of the Defendant's hiring practices can be assessed in light of other evidence suggesting those practices were applied to the comparators for nondiscriminatory reasons. The Defendant argues there is evidence that certain certifications are harder to fill. (ECF No. 125, at 8.) This would sometimes necessitate placing a candidate on a higher Step "in order to make the position and a move to a new district more attractive to a lateral hire." (*Id.*) In support of this assertion, the Defendant proffers a 2019 report by the Pennsylvania Department of Education ("Pa. DoE Report"). (*Id.* (citing ECF No. 126-2).) The Report quantifies the number of teaching certifications issued by the State of Pennsylvania by year in each subject area. The data span from 2010 through 2018. Thus, these data overlap with the hiring of nearly all of the comparators, excluding Ms. Burgunder, Ms. Sebastian, and Ms. Pannebaker, who were hired before 2010. The tables attached hereto in Appendix I reflect all Instructional I and II Certificates issued between 2010 and 2015, which is the latest year in which any comparator was hired.[38]

These data provide some circumstantial evidence of the market for teachers with certain certifications—with some caveats. First, there are inconsistencies in phrasing between the Pa. DoE Report and the parties' Motions.[39] Thus, it is not always clear exactly which certificates listed on the Pa. DoE Report were held by the comparators and Plaintiffs. Second, the Pa. DoE Report does

---

[38] Appendix I as prepared by the Court for purposes of this Opinion collects the data presented on pages 3, 9, and 10 of the Pa. DoE Report, with respect to the numbers of Instructional I and II certificates issued by subject area. (*See* ECF No. 126-2.) Appendix I omits data from the schoolyears 2015-16, 2016-17, and 2017-18, as the latest schoolyear for which any comparator was hired is 2015-16. Thus, the Appendix captures the certificates issued from 2010 until 2015, but excludes any certificates that may have been issued later than the most recent comparator was hired, because the Court concludes that this data is not relevant to the market conditions present at the time that any of the comparators were hired. Unlike the Pa. DoE Report, Appendix I also provides the total number of certificates issued by subject area from 2010 through 2015. Whereas the Pa. DoE Report orders the certificates alphabetically, Appendix I rank-orders the certificates from most-issued to least-issued based on the 2010-2015 total.

[39] For instance, various Plaintiffs and comparators are listed as having certifications in "special education," but using different wording. (*See* ECF No. 102, at 13 ("Special Education"), 17 ("special education, which qualified her to teach special education students in Grades K-12"), 21 ("Special Education inclusive teacher"), 24 ("special education, Grades 1-12"), 27 ("special education, N-21 [sic] years of age").)  As another example, Ms. Glassbrenner's resume states she held a "Mid-Level Mathematics *7–9* Certification." (Glassbrenner Resume, ECF No 103-99, at 1.) The DoE Report lists "ML Math *6–9*." *See infra* Appendix I.

43

not say how many teachers in total held certifications at the time that comparators were hired. For instance, while the report provides that over 30,000 total certifications for Elementary Education were *issued* from 2010 to 2015, it does not say how many teachers in total *held* certifications at any point during that period. The Pa. DoE Report also provides no insight into the years that the *Plaintiffs* were hired between 2003 and 2007. Therefore, the report does not actually show what the market supply of certifications was at any point in time. Third, the Pa. DoE Report does not speak to the market demand for certifications. For instance, while French certifications may have been relatively uncommon, the report does not discuss how many school districts were in need of French teachers. Nonetheless, the Pa. DoE Report still provides some circumstantial evidence from which a jury could reasonably infer which certifications were more or less common during the years that many of the comparators were hired.

Additionally, the Court may consider certain evidence annexed to the otherwise excluded Fellin Report. Despite its evidentiary ruling as to Mr. Fellin's testimony, the Court is permitted to consider underlying data within the report, even if it is not currently in a form that is admissible at trial. *Celotex*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). In order to consider this evidence, the Court must determine whether the Defendant *can* produce it in an admissible form for trial. *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). Under this standard, the Court concludes that the District's hiring records almost certainly could be admitted as records of a regularly conducted business activity. *See* Fed. R. Evid. 803(6). Accordingly, the Court also takes into consideration the tables in Exhibits II and X of the Fellin Report, which are based upon those records. (ECF No. 103-2, at 33, 42.)

Exhibit II contains a list of all male teachers hired above-Step between 2002 and 2015. (*Id.* at 33.) It demonstrates that in the years the District hired the Plaintiffs and comparators, it also hired sixteen (16) male teachers above-Step. Exhibit X breaks down all above-Step hires on a per-year basis between 2000 and 2016. (*Id.* at 42.) Like Exhibit II, Exhibit X also demonstrates that both male and female teachers were hired above-Step in those years. However, it further shows that there were thirty (30) above-Step hires from 2010 until 2015, when most comparators were hired. By contrast, it also shows only two (2) above-Step hires between 2003 and 2007, when all of the Plaintiffs were hired. More specifically, it demonstrates a marked increase in above-Step hires during the years that Curtis Baker was the District Superintendent. In fact, slightly more than half of all above-Step hires between 2000 and 2016 occurred under Curtis Baker's two (2) years as Superintendent. (*Id.*)

Thus, it could on this record be plausible for a jury to reasonably infer from these exhibits and the other circumstantial evidence that, while it did have unwritten Guidelines based on prior teaching experience, the District occasionally departed from those guidelines. In deviating from the Guidelines, for both male and female candidates, it is also plausible that a jury could reasonably infer that the District considered certain other factors to determine above-Step placements. The hiring data also circumstantially support that there was a change in hiring philosophy under Curtis Baker, which resulted in more above-Step hires. While this hiring method seems to permit a level of discretion that could allow for sex-based discrimination, it is the province of the jury to determine when, how, and if at all the District did *in fact* base its decisions on nondiscriminatory factors.

iii.  *Analysis of the Evidence for Each Comparator*

The Plaintiff's fundamental argument is that their Motion must be granted because there is no evidence from which a jury could find that the proffered nondiscriminatory reasons were the *actual* motivations for hiring the comparators above-Step. In their Brief and throughout oral argument, the Plaintiffs made repeated reference to the rule the Third Circuit established in *Stanziale*—the Defendant must produce "sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity." 200 F.3d at 108. However, the procedural posture of *Stanziale* involved a *defendant-employer's* motion for summary judgment. Thus, the standard set in *Stanziale* reflects what a defendant would have to prove at *trial*. However, if a *plaintiff* files a summary judgment motion, "the summary judgment standard requires only that [d]efendants point to record evidence that creates a genuine issue of material fact as to whether factors other than sex explain the pay differential." *Hersh*, No. CV 14-6709, 2016 WL 3059389, at *12. (citing Fed. R. Civ. P. 56(a), (c)(1); *Galli*, 490 F.3d at 270). Another case from this District suggests the same standard. The court in *Day v. Bethlehem Center School District* dealt with a similar set of facts. CIV.A. 07-159, 2008 WL 2036903 (W.D. Pa. May 9, 2008). There, two female teachers alleged EPA violations by their school district and provided two comparators that were given a higher starting salary. *Id.* at *2. Both parties moved for summary judgment. The school district, employing a similar set of guidelines to the one here, started the two male comparators at a higher salary "step" despite their having less teaching experience. *Id.* As here, the defendant provided several disputed reasons to explain the wage disparity—namely, the comparators' salary negotiations and the district's discretion to credit private school experience and experience outside of the district. *Id.* at *3. School board members and administrators were deposed and several could not recall exact reasons for salary disparities,

but some nonetheless testified to probable reasons. *Id.* at *4. The deposition testimony supporting that the comparators themselves negotiated a higher salary was also hotly contested. *Id.* On that record, the court denied both parties' motions. *Id.* at *8–11. The court held that the record evidence presented "material issues of fact that preclude the Court from deciding in Plaintiffs' favor," despite an apparent lack of evidence supporting that the proffered reasons were the *actual motivation* for the salary differential. *Id.* at *8. Consistent with *Hersh*, the *Stanziale* "actual motivation" rule was only applied to the defendant's summary judgment motion. *Id.* at *9.

In assessing these cases, the standard for resolving the Plaintiffs' Motion comes into focus. Upon proffering a sufficient quantum of evidence of nondiscriminatory reasons and associated evidence of its then-regular hiring practices, the Defendant creates a question that the jury must resolve— "Were the nondiscriminatory reasons given the *actual* motivation or not?" *Id.* Under this standard, applying the standard for considering circumstantial or inferential evidence, and viewing all of the record evidence discussed above and below in the light most favorable to the Defendant, the Court finds and concludes that there is a jury question with respect to each proffered comparator. It further concludes more specifically that *at least* the following facts with respect to each comparator are sufficient to defeat the Plaintiffs' Motion for Summary Judgment. That being said, the Court would also caution the Defendant that at trial, it will not be sufficient for it to "prove" what "might have been" the reasons for a particular hire, but instead it nonetheless must still prove by a preponderance of the evidence that the proffered non-discriminatory rationale advanced actually animated those hiring/Step placement decisions.

### Nancy Burgunder

There is a jury question as to whether Nancy Burgunder was hired at Step 2 due to her certifications. *See* Part II.C.1. The Defendant avers that Ms. Burgunder's three certifications made

her an attractive candidate. (ECF No. 102, at 17.) Further, it avers that certifications specifically in Business Technology are "difficult to find." (*Id.*) The certifications data in the Pa. DoE Report reasonably support that this certification has been less common from 2010 through 2015. *See* Appendix I. However, the District hired Ms. Burgunder in the year 2000. Thus, a jury could not reasonably conclude that the Defendant hired Ms. Burgunder at Step 2 to attract her to the District because she had a less common certification. However, Ms. Burgunder was certified in three different subjects. There is deposition testimony that the District favorably considered multiple certifications when hiring because it afforded the District certain flexibility. (ECF No. 108-1, at 72:13–73:2.) None of the Plaintiffs for whom Ms. Burgunder is a comparator—Barthelemy, Espey, and Persing—had multiple certifications. *See* Parts II.B.1, 3, 8; Tables 1–9 (listing comparators). Thus, a jury could reasonably conclude that Ms. Burgunder's multiple certifications were the reason for her above-Step placement.

### *Melissa Sebastian*

There is a jury question as to whether Melissa Sebastian was hired at Step 3 due to her "impressive" interview and the District's need at the time for "good special ed teachers." (ECF No. 103-45, at 8.) Ms. Sebastian was certified in elementary education and special education, and had eight years of teaching experience (three in a public school and five in a private school). *See* Part II.C.2. Ms. Sebastian testified that at the time she was interviewed it was difficult to find good special education teachers. (ECF No. 103-45, at 8.) While the Pa. DoE Report does not capture the year she was hired, Ms. Sebastian provided her first-hand recollection that the District was struggling to find good special education teachers at the time she was hired. (*Id.*) She also testified that she was "impressive" in her interview and was "one of the only teachers" who was able to complete her mock classroom lesson. (*Id.*) Ms. Sebastian is only listed as a comparator for Plaintiff

Eric Jacoby, who also held dual certifications in the same two subject areas and had five years of teaching experience (one in a public school and four in a Catholic school). *See* Part II.B.7; Tables 1–9 (listing comparators). He was hired at Step 1. *Id.* However, there is no record evidence that there was difficulty finding special education teachers when Mr. Jacoby was hired two years later or that he performed particularly well in his interviews. But, a jury could reasonably conclude that Ms. Sebastian's teaching ability and the District's hiring needs were the reasons for her above-Step placement.

### *Amy Pannebaker*

There is a jury question as to whether Amy Pannebaker was hired at Step 3 due to her unique prior experience in teaching and in developing curricula for mathematics, as well as other experience that one administrator testified would be valuable to the District. (Rondinelli Dep., ECF No 106-13, at 31–35.) For instance, Ms. Pannebaker helped develop a math curriculum for the State of Texas and a remedial math curriculum at an elementary school in Pennsylvania. *See* Part II.C.3. She was project assistant at the National Science Foundation, where she again worked on developing a remedial math curriculum and lesson planning. (ECF No. 103-48, at 1.) She was also a year-long substitute teacher in the District, (*Id.*), and there is record evidence that substitute teaching experience within the District was "highly desired," (ECF No. 106-13, at 45.) There is nothing in the record indicating that either of the Plaintiffs who listed Ms. Pannebaker as a comparator had similar experience. *See* Tables 1–9 (listing comparators). Christopher D'Eramo, like Ms. Pannebaker, had three and a half years of prior teaching experience. *See* Part II.B.2. However, there is no record evidence that he had a similar level of allegedly unique and valuable experience. Timothy Hrivnak had one-and-a-half more years of public-school teaching experience than Ms. Pannebaker and he was certified in biology and general science—two of the certifications

that the Defendant avers are less common. *See* Part II.B.6. However, there is no record evidence showing how common or uncommon those certifications were at the time he was hired. Further, his application does not demonstrate any experience in curriculum development, (ECF No. 103-10), and there is no testimony that his non-teaching experience was particularly valuable to the District. Thus, a jury could reasonably conclude that Ms. Pannebaker's prior experience was the reason for her above-Step placement.

### *Adrianne Kaminsky*

There is a jury question as to whether Adrianne Kaminsky was hired at Step 2 due to her significant experience in language education. *See* Part II.C.4. Ms. Kaminsky's resume reflects that she had experience teaching seven levels of Spanish—from level-one to the college level. (ECF No. 103-53, at 1.) A jury could reasonably conclude that Spanish is a less-common certification. *See* Appendix I. Although Ms. Kaminsky had only private-school teaching experience, which would have placed her at Step 1 under the Guidelines, a jury could reasonably conclude that she was placed at Step 2 due to the difficulty in finding and securing qualified Spanish teachers. Ms. Kaminsky is only listed as a comparator for Plaintiff Eric Jacoby, who had one year of public- and four years of private-school teaching experience. *See* Part II.B.7; Tables 1–9 (listing comparators). He was hired at Step 1 with two certifications. Part II.B.7 However, there is no record evidence that, at the time Mr. Jacoby was hired, his certifications were comparably less common. Thus, a jury could reasonably conclude that Ms. Kaminsky's Spanish language experience was the reason for her above-Step placement.

### *Julie Rudi*

There is a jury question as to whether Julie Rudi was hired at Step 3 because she was a "known commodity" and in order to keep her salary commensurate with her former salary. *See*

Part II.C.5. Former Superintendent Milanovich and former Assistant Superintendent Zangaro both testified that, because Ms. Rudi had formerly worked with Bon Meade Principal Ungarean, Ms. Rudi came to the District highly recommended. (ECF Nos. 106-11, at 43:2–44:9; 108-1, at 75:10–76:14.) Ms. Rudi was therefore a "known commodity" because the Principal of the school to which she was ultimately assigned was familiar with her abilities and "really wanted" her. (ECF No. 108-1, at 75:10–19.) A reasonable inference can be drawn from this that Ms. Rudi was hired above-Step because she was a desirable candidate and that, due to that fact, her new salary had to be commensurate with her former salary to attract her to the District. Ms. Rudi's new salary at the District was roughly $3,000 more per year. *See supra* note 12. This is consistent with Bill Addy's testimony that the District would place a teacher at a higher Step if necessary to prevent "harming" anyone coming to the District. (ECF No. 106-1, at 29:15–25.) Ms. Rudi is only listed as a comparator for Timothy Hrivnak, for whom there is no record evidence of former salary or that he came highly recommended. *See* Part II.B.6; Tables 1–9 (listing comparators). Thus, a jury could reasonably conclude that Ms. Rudi's prior work experience and salary were the reasons for her above-Step placement.

### *Melissa Mayo*

There is a jury question as to whether Melissa Mayo was hired at Step 3 due to her certifications. Ms. Mayo held certifications in three subject areas—special education, social studies, and what the Pa. DoE Report would call "ML"—or "mid-level"—English.[40] *See* Part II.C.6; Appendix I. According to the Pa. DoE Report, there is a reasonable inference that mid-level English is relatively less common. Furthermore, there is testimony that the District favorably

---

[40] There is a discrepancy, however, given that the Defendant avers Ms. Mayo's certification was in "English Grades 7–9" and the report details the certifications issued for "ML English 6–9." This minor discrepancy, in view of the fact that there are no other certifications in the report that more closely resemble what the Defendant proffered, does not dispel the reasonable inference that they both refer to the same certification.

considered multiple certifications when hiring because it permitted scheduling flexibility. (ECF No. 108-1, at 72:13–73:2.) Additionally, Ms. Mayo testified that her Masters in special education was "very highly desirable" and that she was certified to be a "pull-out language arts" teacher, where she would work one-on-one with special education students. (ECF No. 106-9, at 16:16–22, 18:12–19.) Ms. Mayo is listed as a comparator for Plaintiffs Barthelemy, D'Eramo, Espey, Hrivnak, and Persing. *See* Tables 1–9 (listing comparators). None of those Plaintiffs had a comparable number of certifications, nor is there testimony that their particular certifications or skills were "highly desirable" when they were hired. *See* Parts II.B.1–3, 6, 8. Thus, a jury could reasonably conclude that Ms. Mayo's certifications and teaching ability were the reasons for her above-Step placement.

### Sarah Durham

There is a jury question as to whether Sarah Durham was hired at Step 2 due to her certification in Business, Computers, and Information Technology. *See* Part II.C.7. The certifications data in the Pa. DoE Report reasonably support that this certification is less common. *See* Appendix I. Furthermore, there is testimonial evidence supporting that Ms. Durham was hired above-Step due to this certification. At the time the District hired Ms. Durham, it simultaneously hired a male candidate with the same certification for a similar position. (ECF No. 106-19, at 61:8–20, 69:7–13.) Both teachers were hired above-Step for these "harder-to-fill positions." (*Id.*) Ms. Durham is listed as a comparator for Plaintiffs Barthelemy, Espey, Herman, Persing, and Wood. *See* Tables 1–9 (listing comparators). There is no record evidence that, at the time the Plaintiffs were hired, their certifications were comparably less common. *See* Parts II.B.1, 3, 5, 8, 9. Thus, a jury could reasonably conclude that Ms. Durham's certification was the reason for her above-Step placement.

### Megen Harmon

There is a jury question as to whether Megen Harmon was hired at Step 2 due to her dual certifications in less-common subject areas. Ms. Harmon was certified to teach both Biology and Chemistry. Part II.C.8. In addition to her multiple certifications allegedly providing scheduling flexibility, (ECF No. 108-1, at 72:13–73:2), the certifications data in the Pa. DoE Report reasonably support that these certifications are significantly less common. *See* Appendix I. There is also testimony supporting that these certifications are more difficult to find. (ECF No. 106-1, at 46.) Ms. Harmon is listed as a comparator for Plaintiffs Barthelemy, Espey, Herman, Persing, and Wood. *See* Tables 1–9 (listing comparators). None of those Plaintiffs had multiple certifications and there is no record evidence that, at the time those Plaintiffs were hired, their certifications were comparably less common. *See* Parts II.B.1, 3, 5, 8, 9. Thus, a jury could reasonably conclude that Ms. Harmon's certifications were the reason for her above-Step placement.

### Morgane Evans

There is a jury question as to whether Morgane Evans was hired at Step 3 due to her certification in French and in order to keep her salary commensurate with her former salary. *See* Part II.C.9. The certifications data in the Pa. DoE Report reasonably support that Ms. Evans held a far less-common certification. *See* Appendix I. She was also hired initially as a "3/5 teacher" at Step 3 with a salary of $29,070, which was a significant pay cut from her former salary of $46,000. (ECF No. 111-3, at 18.) However, she only accepted the cut having been promised to be made a full-time teacher. (*Id.*) When she became full-time, Ms. Evans' salary of $48,450 was roughly commensurate with her salary from two years before. (*Id.* at 23–24.) This is consistent with Bill Addy's testimony that the District would place a teacher at a higher Step if necessary to prevent "harming" anyone coming to the District. (ECF No. 106-1, at 29:15–25.) Ms. Evans is only listed

as a comparator for Timothy Hrivnak, for whom there is no record evidence of former salary. *See* Part II.B.6; Tables 1–9 (listing comparators). Additionally, while Mr. Hrivnak had certifications in subject areas the District regarded as less common, there is no record evidence of how uncommon they might have been in 2003 when he was hired. Part II.B.6. Thus, a jury could reasonably conclude that Ms. Evans' certification and salary were the reasons for her above-Step placement.

### *Kattreena Amodeo*

There is a jury question as to whether Kattreena Amodeo was hired at Step 3 due to having three certifications. Ms. Amodeo was certified in special education, early childhood education, and elementary education. Part II.C.10. There is deposition testimony that the District favorably considered multiple certifications when hiring because it afforded the District certain flexibility. (ECF No. 108-1, at 72:13–73:2.) Ms. Amodeo is listed as a comparator for Plaintiffs Barthelemy, D'Eramo, Espey, Herman, Hrivnak, Persing, and Wood. *See* Tables 1–9 (listing comparators). Of those Plaintiffs, only Timothy Hrivnak had multiple certifications. *See* Parts II.B.1–3, 5, 6, 8, 9. However, Mr. Hrivnak held two certifications. Part II.B.6. Additionally, the certifications data in the Pa. DoE Report reasonably support that Ms. Amodeo's early childhood education certification is relatively less common. *See* Appendix I. There is no record evidence that, at the time the Plaintiffs were hired, their certifications were comparably less common. Thus, a jury could reasonably conclude that Ms. Amodeo's was hired above-Step due to having more certifications than any of the compared Plaintiffs, and because one of her certifications was relatively less common.

### Caryn Glassbrenner

There is a jury question as to whether Caryn Glassbrenner was hired at Step 3 due to having three certifications. Ms. Glassbrenner was certified in mid-level mathematics, elementary education, and early childhood education. Part II.C.11. In addition to having multiple certifications, a jury could reasonably conclude that two of Ms. Glassbrenner's certifications—mid-level mathematics and early childhood education—were less-common. *See* Appendix I. Ms. Glassbrenner is listed as a comparator for Plaintiffs Barthelemy, D'Eramo, Espey, Hrivnak, and Persing. *See* Tables 1–9 (listing comparators). None of these Plaintiffs held three certifications and there is no record evidence that, at the time the Plaintiffs were hired, their certifications were comparably less common. *See* Part II.B.1–3, 6, 8. Thus, a jury could reasonably conclude that Ms. Glassbrenner was hired above-Step due to having more certifications than any of the compared Plaintiffs, and because two of her certifications were relatively less common.

### Alicia Schooley

There is a jury question as to whether Alicia Schooley was hired at Step 3 due to her total years of teaching and her time as a substitute teacher within the District. Ms. Schooley had four (4) years of public-school and one (1) year of private school teaching experience, as well as two (2) years of experience as a day-to-day substitute within the District. *See* Part II.C.12. Based on deposition testimony, a jury could reasonably conclude that the Defendant credited her private school experience. (ECF Nos. 106-10, at 19:8–20; 108-1, at 18:11–13.) Additionally, there is record evidence that substitute teaching experience within the District was "highly desired." (ECF No. 106-13, at 45.) Ms. Schooley is only listed as a comparator for Timothy Hrivnak, who had five (5) years of public-school teaching experience prior to his hiring. *See* Part II.B.6; Tables 1–9 (listing comparators). There is no record evidence that Mr. Hrivnak had any prior work experience

in the District that would have enabled him to "know the [District's] schedules" and "what was needed within the District." (ECF No. 106-13, at 45.) Based on the record evidence, a jury could reasonably conclude that the District hired Ms. Schooley above-Step by favorably considering her year of private-school teaching in addition to her two years of day-to-day substitute teaching within the District itself.

### Kaitlyn Robson

There is a jury question as to whether Kaitlyn Robson was hired at Step 2 due to her certification in a less-common subject area. Ms. Robson was certified to teach Biology. Part II.C.13. The certifications data in the Pa. DoE Report reasonably support that biology certifications are relatively less common. *See* Appendix I. There is also testimony supporting that hard science certifications are more difficult to find. (ECF No. 106-1, at 46.) Ms. Robson is listed as a comparator for Plaintiffs Barthelemy, Espey, Herman, Persing, and Wood. *See* Tables 1–9 (listing comparators). There is no record evidence that, at the time those Plaintiffs were hired, their certifications were comparably less common. *See* Parts II.B.1, 3, 5, 8, 9. Thus, a jury could reasonably conclude that Ms. Harmon's biology certification was the reason for her above-Step placement.

### Kaylee Stewart

There is a jury question as to whether Kaylee Stewart was hired at Step 2 due to her certification in a less-common subject area and her practical work experience. Ms. Stewart was certified to teach Chemistry. Part II.C.14. The certifications data in the Pa. DoE Report reasonably support that chemistry certifications are relatively less common. *See* Appendix I. There is also testimony supporting that hard science certifications are more difficult to find. (ECF No. 106-1, at 46.) Additionally, Ms. Stewart worked as a chemist at PPG Industries. Part II.C.14. The District

avers that this experience was one of the criteria which made Ms. Stewart a "rock star" under the "Baker Guidelines." (ECF No. 102, at 26.) Ms. Stewart is listed as a comparator for Plaintiffs Barthelemy, Espey, Herman, Persing, and Wood. *See* Tables 1–9 (listing comparators). There is no record evidence that, at the time those Plaintiffs were hired, their certifications were comparably less common. *See* Parts II.B.1, 3, 5, 8, 9. Additionally, her work as a chemist could be the type of skill that Ms. Stewart "[brought] to the table in terms of professionalism and experience," which a jury could reasonably find the District considered when determining her salary. (ECF No. 106-1, at 71:9–14.) Thus, a jury could reasonably conclude that Ms. Stewart's chemistry certification and experience as a chemist were the reason for her above-Step placement.

### Katelyn Schulmeister

There is a jury question as to whether Katelyn Schulmeister was hired at Step 2 due to her multiple certifications and work experience. Ms. Schulmeister had one year of public-school teaching experience as well as certifications in elementary education, special education, and reading specialist. Part II.C.15. Ms. Schulmeister also worked with special needs students as a paraprofessional and then a teacher for three (3) years at the D.T. Watson Institute. *Id.* There is deposition testimony supporting that work experience at the D.T. Watson Institute was particularly valuable. (ECF No. 106-13, at 33:19–34:3 (discussing Ms. Pannebaker's prior experience at D.T. Watson); *see also* ECF No. 106-1, at 71:9–14 (discussing how other professional experience may impact Step placement).) Ms. Schulmeister is listed as a comparator for Plaintiffs Barthelemy, Espey, Herman, Persing, and Wood. *See* Tables 1–9 (listing comparators). None of those Plaintiffs had a comparable number of certifications. *See* Parts II.B.1, 3, 5, 8, 9. Thus, a jury could reasonably conclude that Ms. Schulmeister was hired above-Step due to having more certifications than any of the compared Plaintiffs, and due to her prior work experience at D.T. Watson.

### Bridgette (Dawson) Hinterliter

There is a jury question as to whether Bridgette Hinterliter was hired at Step 2 due to her dual certifications and work experience. Ms. Hinterliter was certified to teach both elementary and special education. Part II.C.16. Additionally, she had training and experience in the Wilson Reading Program, which her interviewers highlighted throughout their notes taken during Ms. Hinterliter's interviews. (ECF No. 103-131, at 1, 4, 7, 10, 16.) Ms. Hinterliter is listed as a comparator for Plaintiffs Barthelemy, Espey, Herman, Persing, and Wood. *See* Tables 1–9 (listing comparators). None of those Plaintiffs had a comparable number of certifications. *See* Parts II.B.1, 3, 5, 8, 9. Further, there is no evidence that they had prior work experience that the District may have found as valuable as Ms. Hinterliter's experience in reading education. Thus, a jury could reasonably conclude that Ms. Schulmeister was hired above-Step due to having more certifications than any of the compared Plaintiffs, and due to her reading education training through the Wilson Reading Program.

### Amber Graves

There is a jury question as to whether Amber Graves was hired at Step 8 due to her multiple certifications, significant years of teaching experience, and her negotiations to obtain commensurate salary. Ms. Graves had sixteen and a half years of prior teaching experience and held certifications in elementary education, early childhood education, and as a reading specialist. Part II.C.17. She was also awarded Teacher of the Year. *Id.* Additionally, there is testimony that Ms. Graves negotiated to obtain comparable salary to her former position. *Id.*; (ECF No. 106-1, at 64.); *see also supra* note 25. Ms. Graves is listed as a comparator for Plaintiff Ferri. *See* Tables 1–9 (listing comparators). Unlike Ms. Graves, Mr. Ferri held one certification and had seven (7) years of teaching experience. *See* Part II.B.4. There is also no evidence that he negotiated for a higher

Step in order to obtain commensurate salary. Thus, a jury could reasonably conclude that Ms. Graves was hired well-above Step 3 due to her many years of teaching, her accolades, and her negotiation with the District.

### Jennifer (LeGrand) Mattucci

There is a jury question as to whether Jennifer Mattucci was hired at Step 4 due to her specialization in writing. Ms. Mattucci had seven years of prior teaching experience and was certified to teach English for grades 7–12. Part II.C.18. She had experience in teaching writing and she redesigned the writing curriculum at her former school district. (ECF No. 103-140, at 1.) She was hired at a time that the Defendant avers the District was focused on writing education. The record evidence of this claim is minimal. However, Ms. Mattucci was hired at Step 4 specifically to be an eighth grade Writing Teacher for the District's "Yellow Jackets" special education "team," evidencing the District's interest in writing education. (ECF No. 103-138; *see also* ECF No. 124-13, at 39 (discussing special education teams).) This was one Step above the Guidelines, which normally do not permit hiring above Step 3. Part II.C.18. Ms. Mattucci is listed as a comparator for Plaintiff Ferri. *See* Tables 1–9 (listing comparators). Mr. Ferri also had seven (7) years of experience and had a certification in Social Studies. Part II.B.4. Mr. Ferri was hired twelve (12) years before Ms. Mattucci as a high school social studies teacher. (ECF No. 103-14, at 2.) There is no evidence to show that the District was placing special emphasis on any particular teaching ability when it hired him. Thus, viewed in the light most favorable to the Defendant, a jury could reasonably conclude that the District specifically needed a writing teacher and Ms. Mattucci was compensated above-Step due to her specialization and experience in that subject area.

Based on the forgoing, there is a jury question with respect to each proffered comparator. While the evidence that creates those questions is not overwhelming or necessarily self-evident, it

is for the reasons noted sufficient to avoid the grant of summary judgment in favor of each of the Plaintiffs. The Plaintiffs have not demonstrated as a matter of law that the Defendant cannot meet its burden under the EPA as to any Plaintiff. A jury at trial will be required to make fact-based determinations into among other things (1) the import of the record evidence—the hiring data, certificates issued by the State, and personnel records; and (2) the credibility of testimony concerning the District's routine hiring practices to determine whether the Defendant's actual Step placement motivations and decisions were nondiscriminatory and lawful for purposes of the Equal Pay Act.

## IV.   **CONCLUSION**

The mountain of record evidence advanced here cannot be and under the law should not be scaled by the Court on its own. Only a jury may resolve the many determinations of factual inference, weight, and credibility that are inherent in the arguments advanced by the parties. Thus, for the reasons set out above, the Court will deny the Plaintiffs' and Defendant's cross-Motions for Summary Judgment, (ECF Nos. 100, 104), and the case will now proceed to trial.[41]

An appropriate Order will follow.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:      April 16, 2020

cc:      All counsel of record

---

[41] And ordinarily, as the case and context now exist, the Court would swiftly send the parties to mediation, given that the trial will likely consume lots of preparation and in-court time and expense for the Plaintiffs, for the Defendant, for current and former School Board members, for current senior District Administrators, and for former senior District Administrators. But this case has already been down that road, several times. And those considerations are all things that are either self-evident or are topics that the Court went over with counsel before sending the matter to the most recent mediation. As the Court noted at the time, the parties are represented by very experienced counsel, so the Court is confident that all of the vagaries, costs, and uncertainties of trying a reasonably complicated case to a jury, over the many days that the parties will argue that this case will take to try, have presumably been considered by the parties. At this point, as they might say at Churchill Downs, it's "off to the races."  The Court will shortly enter a standard pretrial order outlining the process by which the parties will now get the case teed up for trial, such that they will be ready to go when the Court has a civil trial window available to it and for the parties.

**APPENDIX I**

**Number of Instructional I Certificates Issued by Subject Area**

| Subject Area | 2010-2011 | | | 2011-2012 | | | 2012-2013 | | | 2013-2014 | | | 2014-2015 | | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In State | Out of State | Add Ons | In State | Out of State | Add Ons | In State | Out of State | Add Ons | In State | Out of State | Add Ons | In State | Out of State | Add Ons | |
| Elementary K-6 | 5508 | 691 | 0 | 5037 | 484 | 0 | 5019 | 902 | 0 | 39 | 4 | 0 | 0 | 0 | 0 | 17684 |
| Special Education PK-12 | 2580 | 280 | 0 | 2441 | 168 | 0 | 3166 | 366 | 0 | 20 | 3 | 0 | 1 | 0 | 0 | 9025 |
| Grades PK-4 | 1 | 4 | 0 | 58 | 6 | 0 | 1110 | 14 | 0 | 2996 | 297 | 18 | 2955 | 408 | 166 | 8033 |
| English 7-12 | 867 | 146 | 527 | 713 | 112 | 632 | 836 | 113 | 695 | 666 | 128 | 418 | 509 | 120 | 293 | 6775 |
| Social Studies 7-12 | 911 | 132 | 163 | 697 | 91 | 250 | 805 | 103 | 270 | 722 | 111 | 169 | 516 | 99 | 109 | 5148 |
| ML Math 6-9 | 5 | 35 | 1045 | 20 | 28 | 1191 | 10 | 57 | 1739 | 0 | 1 | 6 | 2 | 0 | 1 | 4140 |
| Special Education PK-8 | 36 | 7 | 0 | 32 | 2 | 0 | 511 | 47 | 0 | 1471 | 85 | 0 | 1591 | 111 | 0 | 3893 |
| Reading Specialist PK-12 | 359 | 46 | 0 | 487 | 32 | 0 | 768 | 50 | 0 | 605 | 54 | 0 | 438 | 47 | 490 | 3376 |
| Math 7-12 | 624 | 73 | 140 | 563 | 73 | 166 | 554 | 85 | 155 | 384 | 69 | 73 | 299 | 69 | 42 | 3369 |
| Early Childhood N-3 | 1085 | 118 | 1 | 1026 | 69 | 0 | 857 | 133 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 3304 |
| ML English 6-9 | 1 | 28 | 569 | 6 | 15 | 771 | 0 | 10 | 1235 | 0 | 0 | 19 | 0 | 0 | 0 | 2654 |
| Health & Physical Ed PK-12 | 455 | 77 | 0 | 406 | 46 | 0 | 460 | 53 | 0 | 346 | 60 | 0 | 228 | 61 | 0 | 2192 |
| Music PK-12 | 424 | 79 | 5 | 361 | 58 | 9 | 359 | 50 | 12 | 370 | 58 | 5 | 328 | 49 | 8 | 2175 |
| Biology 7-12 | 309 | 48 | 111 | 226 | 33 | 119 | 221 | 39 | 140 | 180 | 45 | 107 | 140 | 29 | 95 | 1842 |
| Speech & Language Impaired PK-12 | 261 | 58 | 0 | 221 | 35 | 0 | 315 | 81 | 0 | 369 | 101 | 0 | 241 | 57 | 0 | 1739 |
| Art PK-12 | 383 | 54 | 26 | 263 | 32 | 23 | 325 | 32 | 35 | 262 | 30 | 25 | 196 | 20 | 22 | 1728 |
| ML Science 6-9 | 3 | 23 | 345 | 7 | 12 | 398 | 4 | 22 | 666 | 0 | 1 | 4 | 0 | 0 | 1 | 1486 |
| General Science 7-12 | 115 | 6 | 126 | 66 | 7 | 161 | 83 | 13 | 203 | 45 | 6 | 127 | 35 | 16 | 67 | 1076 |
| Bus-Comp-Info Tech PK-12 | 127 | 25 | 103 | 109 | 11 | 147 | 81 | 14 | 175 | 47 | 14 | 89 | 33 | 10 | 72 | 1057 |
| ML Citizenship 6-9 | 0 | 16 | 190 | 1 | 6 | 250 | 1 | 7 | 484 | 0 | 0 | 5 | 0 | 0 | 0 | 960 |
| Library Science PK-12 | 70 | 9 | 120 | 60 | 4 | 170 | 57 | 7 | 175 | 39 | 7 | 118 | 27 | 8 | 72 | 943 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spanish PK-12 | 159 | 29 | 35 | 120 | 18 | 43 | 129 | 27 | 54 | 99 | 44 | 26 | 100 | 20 | 23 | 926 |
| Chemistry 7-12 | 112 | 13 | 67 | 77 | 5 | 92 | 85 | 16 | 91 | 57 | 14 | 75 | 47 | 11 | 55 | 817 |
| Family-Consumer Sci PK-12 | 46 | 5 | 91 | 29 | 2 | 122 | 60 | 6 | 133 | 27 | 6 | 86 | 17 | 3 | 67 | 700 |
| Grades 4-8 Math | 3 | 0 | 0 | 13 | 0 | 1 | 64 | 4 | 4 | 240 | 22 | 25 | 212 | 27 | 79 | 694 |
| Grades 4-8 English | 0 | 0 | 0 | 1 | 0 | 1 | 78 | 4 | 8 | 170 | 16 | 22 | 168 | 40 | 119 | 627 |
| Technology Ed PK-12 | 79 | 8 | 29 | 73 | 2 | 73 | 64 | 5 | 80 | 49 | 6 | 31 | 35 | 2 | 50 | 586 |
| Grades 4-8 Science | 7 | 0 | 0 | 7 | 0 | 0 | 107 | 6 | 5 | 149 | 16 | 12 | 117 | 16 | 62 | 504 |
| Physics 7-12 | 51 | 11 | 39 | 44 | 4 | 52 | 52 | 12 | 70 | 33 | 6 | 41 | 31 | 9 | 41 | 496 |
| Earth & Space Science 7-12 | 59 | 3 | 39 | 46 | 6 | 65 | 55 | 11 | 56 | 28 | 4 | 45 | 21 | 6 | 20 | 464 |
| Communications 7-12 | 75 | 2 | 31 | 49 | 2 | 38 | 59 | 4 | 53 | 50 | 1 | 28 | 28 | 2 | 10 | 432 |
| Special Education 7-12 | 1 | 2 | 0 | 8 | 2 | 0 | 28 | 5 | 0 | 122 | 17 | 0 | 171 | 43 | 0 | 399 |
| Grades 4-8 Social Studies | 1 | 0 | 0 | 5 | 0 | 0 | 55 | 1 | 3 | 110 | 15 | 9 | 109 | 8 | 50 | 366 |
| Citizenship 7-12 | 94 | 5 | 5 | 70 | 3 | 8 | 72 | 2 | 12 | 45 | 0 | 7 | 38 | 0 | 3 | 364 |
| French PK-12 | 51 | 14 | 13 | 30 | 5 | 11 | 28 | 8 | 15 | 23 | 17 | 9 | 16 | 11 | 11 | 262 |
| Health PK-12 | 48 | 1 | 7 | 30 | 4 | 13 | 43 | 1 | 23 | 37 | 1 | 14 | 17 | 2 | 6 | 247 |
| Safety/Driver Ed 7-12 | 0 | 0 | 40 | 6 | 0 | 37 | 6 | 0 | 60 | 4 | 1 | 37 | 3 | 0 | 43 | 237 |
| Environmental Ed PK-12 | 19 | 0 | 35 | 10 | 0 | 52 | 5 | 0 | 51 | 4 | 1 | 33 | 6 | 0 | 6 | 222 |
| Hearing Impaired PK-12 | 23 | 9 | 0 | 17 | 7 | 0 | 21 | 15 | 0 | 8 | 14 | 0 | 18 | 12 | 0 | 144 |
| Agriculture PK-12 | 13 | 2 | 3 | 16 | 3 | 11 | 10 | 2 | 12 | 14 | 1 | 5 | 16 | 1 | 6 | 115 |
| German PK-12 | 17 | 9 | 8 | 11 | 2 | 6 | 14 | 6 | 6 | 7 | 2 | 12 | 8 | 2 | 3 | 113 |
| Visually Impaired PK-12 | 21 | 2 | 0 | 17 | 0 | 0 | 13 | 2 | 1 | 17 | 1 | 0 | 19 | 1 | 0 | 94 |
| Latin PK-12 | 9 | 2 | 7 | 8 | 0 | 1 | 7 | 3 | 5 | 5 | 2 | 6 | 6 | 5 | 3 | 69 |
| Marketing Ed PK-12 | 2 | 1 | 6 | 1 | 1 | 19 | 0 | 1 | 22 | 1 | 0 | 4 | 0 | 0 | 4 | 62 |
| Social Science 7-12 | 6 | 3 | 0 | 5 | 4 | 3 | 0 | 1 | 13 | 0 | 3 | 7 | 2 | 1 | 0 | 48 |
| Cooperative Ed 7-12 | 7 | 0 | 0 | 7 | 0 | 0 | 14 | 0 | 0 | 13 | 0 | 0 | 4 | 0 | 0 | 45 |
| Chinese PK-12 | 1 | 2 | 5 | 0 | 0 | 1 | 2 | 3 | 5 | 3 | 3 | 3 | 2 | 1 | 1 | 32 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Italian PK-12** | 1 | 1 | 3 | 2 | 1 | 0 | 0 | 0 | 2 | 1 | 2 | 2 | 1 | 0 | 1 | 17 |
| **Japanese PK-12** | 1 | 0 | 0 | 1 | 0 | 2 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 9 |
| **Arabic PK-12** | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 5 |
| **Portuguese PK-12** | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| **Russian PK-12** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| **Turkish PK-12** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| **American Sign Lang PK-12** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **English Designation Grades 4-8** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Grades 5-6** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Special Ed Expansion 7-12** | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | NA | 0 |
| **Urdu PK-12** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Number of Instructional II Certificates Issued by Subject Area**

| Subject Area | 2010-2011 | | | 2011-2012 | | | 2012-2013 | | | 2013-2014 | | | 2014-2015 | | | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | In State | Out of State | Add Ons | In State | Out of State | Add Ons | In State | Out of State | Add Ons | In State | Out of State | Add Ons | In State | Out of State | Add Ons | |
| Elementary K-6 | 4185 | 7 | 0 | 2953 | 7 | 0 | 3624 | 15 | 0 | 2887 | 1 | 0 | 2449 | 0 | 0 | 16128 |
| Special Education PK-12 | 1722 | 10 | 0 | 1272 | 4 | 0 | 1757 | 15 | 1 | 1444 | 0 | 0 | 1260 | 0 | 0 | 7485 |
| English 7-12 | 808 | 3 | 182 | 579 | 1 | 192 | 747 | 3 | 201 | 658 | 3 | 117 | 562 | 1 | 87 | 4144 |
| ML Math 6-9 | 635 | 0 | 201 | 466 | 0 | 266 | 636 | 0 | 446 | 523 | 0 | 0 | 466 | 0 | 0 | 3639 |
| Reading Specialist PK-12 | 738 | 17 | 0 | 471 | 12 | 0 | 617 | 17 | 0 | 555 | 18 | 0 | 423 | 16 | 435 | 3319 |
| Early Childhood N-3 | 614 | 1 | 0 | 429 | 2 | 0 | 623 | 1 | 0 | 514 | 0 | 0 | 426 | 0 | 0 | 2610 |
| ML English 6-9 | 406 | 2 | 170 | 280 | 2 | 221 | 393 | 0 | 349 | 328 | 0 | 4 | 339 | 0 | 1 | 2495 |
| Social Studies 7-12 | 484 | 0 | 64 | 363 | 1 | 99 | 466 | 0 | 74 | 419 | 2 | 49 | 336 | 1 | 31 | 2389 |
| Math 7-12 | 466 | 0 | 21 | 361 | 2 | 34 | 429 | 1 | 24 | 359 | 0 | 6 | 331 | 2 | 6 | 2042 |
| Health & Physical Ed PK-12 | 359 | 1 | 0 | 216 | 2 | 0 | 260 | 1 | 0 | 225 | 0 | 0 | 194 | 1 | 0 | 1259 |
| ML Science 6-9 | 205 | 0 | 77 | 133 | 0 | 93 | 197 | 0 | 178 | 173 | 0 | 1 | 161 | 0 | 0 | 1218 |
| Biology 7-12 | 233 | 0 | 28 | 162 | 0 | 32 | 211 | 1 | 32 | 193 | 0 | 28 | 159 | 0 | 28 | 1107 |
| Bus-Comp-Info Tech PK-12 | 206 | 0 | 55 | 116 | 0 | 65 | 169 | 0 | 75 | 145 | 0 | 40 | 108 | 1 | 50 | 1030 |
| ML Citizenship 6-9 | 150 | 0 | 57 | 98 | 0 | 89 | 154 | 0 | 149 | 121 | 0 | 2 | 115 | 0 | 0 | 935 |
| Library Science PK-12 | 114 | 0 | 106 | 87 | 0 | 86 | 133 | 0 | 97 | 85 | 1 | 66 | 79 | 0 | 72 | 926 |
| Music PK-12 | 226 | 1 | 1 | 155 | 0 | 2 | 202 | 0 | 3 | 162 | 0 | 0 | 157 | 1 | 0 | 910 |
| Art PK-12 | 168 | 1 | 11 | 132 | 0 | 13 | 186 | 0 | 7 | 167 | 0 | 10 | 131 | 1 | 7 | 834 |
| General Science 7-12 | 174 | 0 | 25 | 111 | 0 | 27 | 148 | 0 | 45 | 149 | 0 | 18 | 117 | 0 | 15 | 829 |
| Spanish PK-12 | 194 | 0 | 6 | 116 | 0 | 5 | 141 | 2 | 5 | 124 | 0 | 6 | 135 | 0 | 1 | 735 |
| Speech & Language Impaired PK-12 | 115 | 0 | 0 | 100 | 0 | 0 | 150 | 1 | 0 | 134 | 0 | 0 | 146 | 1 | 0 | 647 |
| Family-Consumer Sci PK-12 | 104 | 0 | 39 | 54 | 0 | 37 | 96 | 0 | 54 | 80 | 0 | 28 | 71 | 0 | 27 | 590 |
| Chemistry 7-12 | 111 | 0 | 17 | 77 | 0 | 21 | 123 | 0 | 22 | 98 | 0 | 18 | 87 | 0 | 11 | 585 |
| Technology Ed PK-12 | 96 | 0 | 15 | 79 | 0 | 25 | 80 | 0 | 44 | 67 | 0 | 13 | 60 | 0 | 34 | 513 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Physics 7-12** | 65 | 1 | 12 | 68 | 0 | 20 | 60 | 0 | 19 | 58 | 0 | 10 | 59 | 0 | 13 | 385 |
| **Citizenship 7-12** | 112 | 0 | 5 | 74 | 0 | 3 | 81 | 0 | 8 | 56 | 0 | 1 | 42 | 0 | 2 | 384 |
| **Earth & Space Science 7-12** | 68 | 0 | 16 | 45 | 0 | 23 | 77 | 0 | 12 | 65 | 0 | 8 | 50 | 0 | 8 | 372 |
| **Communications 7-12** | 90 | 0 | 11 | 63 | 0 | 4 | 61 | 0 | 19 | 38 | 0 | 12 | 46 | 0 | 8 | 352 |
| **Safety/Driver Ed 7-12** | 39 | 0 | 8 | 26 | 0 | 7 | 25 | 0 | 30 | 35 | 0 | 18 | 30 | 0 | 28 | 246 |
| **Environmental Ed PK-12** | 45 | 0 | 23 | 22 | 0 | 17 | 37 | 0 | 15 | 36 | 0 | 10 | 23 | 0 | 5 | 233 |
| **French PK-12** | 48 | 0 | 1 | 36 | 0 | 2 | 29 | 0 | 0 | 51 | 0 | 3 | 37 | 0 | 4 | 211 |
| **Health PK-12** | 25 | 0 | 14 | 11 | 0 | 9 | 22 | 0 | 13 | 23 | 0 | 10 | 20 | 0 | 4 | 151 |
| **German PK-12** | 26 | 0 | 0 | 19 | 0 | 0 | 24 | 0 | 1 | 24 | 0 | 0 | 17 | 0 | 1 | 112 |
| **Hearing Impaired PK-12** | 17 | 1 | 0 | 19 | 0 | 0 | 20 | 0 | 0 | 20 | 0 | 0 | 16 | 1 | 0 | 94 |
| **Special Education PK-8** | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 2 | 0 | 19 | 1 | 0 | 54 | 6 | 0 | 89 |
| **Visually Impaired PK-12** | 18 | 0 | 0 | 14 | 0 | 0 | 22 | 0 | 0 | 20 | 0 | 0 | 14 | 0 | 0 | 88 |
| **Agriculture PK-12** | 15 | 0 | 0 | 11 | 0 | 4 | 13 | 0 | 7 | 6 | 0 | 1 | 16 | 0 | 5 | 78 |
| **Cooperative Ed 7-12** | 20 | 0 | 0 | 12 | 0 | 0 | 18 | 0 | 0 | 18 | 0 | 0 | 9 | 0 | 0 | 77 |
| **Marketing Ed PK-12** | 14 | 0 | 7 | 9 | 0 | 9 | 5 | 0 | 8 | 8 | 0 | 2 | 8 | 0 | 6 | 76 |
| **Grades PK-4** | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 5 | 7 | 3 | 5 | 3 | 47 | 74 |
| **Latin PK-12** | 7 | 0 | 2 | 5 | 0 | 0 | 7 | 0 | 1 | 9 | 0 | 1 | 5 | 0 | 0 | 37 |
| **Special Education 7-12** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 11 | 0 | 0 | 21 | 3 | 0 | 36 |
| **Social Science 7-12** | 6 | 0 | 0 | 5 | 0 | 1 | 8 | 0 | 4 | 0 | 0 | 3 | 1 | 0 | 0 | 28 |
| **Chinese PK-12** | 5 | 0 | 1 | 3 | 0 | 0 | 2 | 0 | 1 | 4 | 0 | 0 | 4 | 0 | 0 | 20 |
| **Office Technologies 7-12** | 6 | 0 | 0 | 5 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 19 |
| **Accounting 7-12** | 6 | 0 | 0 | 3 | 0 | 0 | 5 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 17 |
| **Grades 4-8 English** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 12 | 16 |
| **Italian PK-12** | 2 | 0 | 0 | 2 | 0 | 0 | 5 | 0 | 1 | 2 | 0 | 1 | 1 | 0 | 0 | 14 |
| **Home Economics K-12** | 7 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 13 |
| **Grades 4-8 Science** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 8 | 12 |
| **Grades 4-8 Math** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 7 | 10 |

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Grades 4-8 Social Studies** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 7 | 10 |
| **Secretarial 7-12** | 2 | 0 | 0 | 3 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 10 |
| **Data Processing 7-12** | 3 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 9 |
| **Instructional Tech Specialist** | 0 | 0 | 0 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| **Typewriting 7-12** | 2 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 6 |
| **Japanese PK-12** | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 4 |
| **Principal PK-12** | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| **Secondary School Counselor** | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| **Arabic PK-12** | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| **Athletic Coach 7-12** | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 3 |
| **Elementary School Counselor** | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| **Portuguese PK-12** | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| **Russian PK-12** | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| **Distributive Education 7-12** | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Sociology 7-12** | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| **American Sign Language PK-12** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **English Designation Grades 4-8** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Grades 5-6** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Turkish PK-12** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |